1    IN THE DISTRICT COURT OF THE UNITED STATES
         FOR THE NORTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3

UNITED STATES OF AMERICA,      )
4                              )
              Plaintiff,       )    Magistrate White
5                              )    Cleveland, Ohio
         vs.                   )
6                              )
IZAK ZIRK DE MAISON,           )    Number 1:14MJ3131
7                              )
              Defendant.       )
8

9

10                     - - - - -
              TRANSCRIPT OF PROCEEDINGS HAD BEFORE
11
              THE HONORABLE GREG WHITE
12
              MAGISTRATE JUDGE OF SAID COURT,
13
              ON THURSDAY, OCTOBER 9, 2014
14                     - - - - -

15

16

17

18   Official Court Reporter:      Shirle M. Perkins, RDR, CRR
                                   U.S. District Court
19                                 801 West Superior, #7-189
                                   Cleveland, OH 44113-1829
20                                 (216) 357-7106

21

22

23

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.
25

```
1    APPEARANCES:

2

3    For the Government:         CHRISTOS GEORGALIS,
                                 Assistant U.S. Attorney
4                                801 West Superior Avenue
                                 Cleveland, OH 44113
5                                (216) 622-3600

6

7    For the Defendant:          ALAN FELLHEIMER, ESQ.,
                                 Fellheimer & Eichen
8                                2 Liberty Place - 34th Fl.
                                 50 South 16th Street
9                                Philadelphia, PA 19102
                                 (215) 253-6631
10

11                               PAMELA A. BOLTON, ESQ.,
                                 Leech Tishman Fuscaldo & Lampl
12                               28th Floor
                                 525 William Penn Place
13                               Pittsburgh, PA 15219
                                 412-261-1600
14

15

16

17

18

19

20

21

22

23

24

25
```

1      Thursday Session, October 9, 2014, at 2:11 p.m.

2                  DEPUTY CLERK:  Your Honor, the case before the

3      Court carries Case Number 1:14MJ3131, United States of

4      America versus Izak Zirk De Maison.

14:12:59  5                  THE COURT:  All right.

6          Now, that I've gained entrance into the courtroom.  I

7      appreciate everyone being here.  Mr. Georgalis, are you

8      ready to start?

9                  MR. GEORGALIS:  Yes.

14:13:08 10          Chris Georgalis on behalf of the United States.

11      Seated to my left is AUSA Hollingsworth.  Also at counsel

12      table is Special Agent Sean McGovern and Intelligent Analyst

13      with the FBI, Bill Heffernan.

14                  THE COURT:  Thank you.

14:13:19 15          And, Mr. Fellheimer?

16                  MR. FELLHEIMER:  Good afternoon, your Honor.

17          Alan Fellheimer, and Pamela Bolton, here representing

18      the Defendant, Mr. De Maison.  And Mr. De Maison is here.

19                  THE COURT:  All right.  Thank you.

14:13:32 20          I'm not going to be able to say that like you do.

21      But, that's fine.

22                  MR. FELLHEIMER:  Your Honor, that's only

23      attributed to my high school French.

24                  THE COURT:  Okay.  Very good.

14:13:40 25          I didn't have any of that.  Okay.  So I'm going to --

1    you are Izak Zirk De Maison, sir?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Okay.  Very good.  All right.

4         So we're here for a detention hearing today.  And, Mr.

14:13:54  5    Georgalis, you want to proceed?

6              MR. GEORGALIS:  Yes, Judge.

7         We'll waive opening statements.  And I'll proffer the

8    PSR in this case.  And I'd like to call our first witness,

9    Special Agent Sean McGovern.

14:14:02 10              THE COURT:  Okay.

11         And I would ask Mr. Fellheimer, do you have any

12    opening remarks you'd like to make, sir?

13              MR. FELLHEIMER:  I can make one quickly, your

14    Honor, if your Honor would permit it.

14:14:11 15              THE COURT:  Sure.

16

17

18

19

20

21

22

23

24

25

1    <u>OPENING STATEMENTS ON BEHALF OF THE DEFENSE</u>

2             MR. FELLHEIMER:  We are trying to fashion --

3    we have tried to fashion -- well, first this Court, I

4    believe, under the statute, is charged with finding the

14:14:25  5    least-restrictive way of protecting the Government, the

6    interests of having Mr. De Maison here and for purposes of

7    trial and for other purposes, and that he will come and not

8    leave the jurisdiction, and not -- and not leave.

9             We have offered A, to take his passport; B, put him

14:14:51 10    on -- we have found him an apartment less than a mile from

11    here -- eight-tenths of a mile walking, nine-tenths of a

12    mile in a car -- where he could stay.  He won't leave the

13    apartment except to buy food and come to this courthouse.

14    But, having him in Youngstown Correctional Facility makes it

14:15:09 15    very difficult for him to do what he has to do.

16             You can't take a computer in there.  Not even I can

17    take a computer in there.  You can't get him documents.  To

18    give your Honor an idea, there is in the hands of FedEx

19    Ground, right now, two pallets full of documents which were

14:15:32 20    in the -- Mr. De Maison, excuse me, in the offices of Gepco

21    Lustros and Mr. and Mrs. -- Mr. De Maison, which were put

22    into a storage locker.

23             Someone did me a favor and went to the locker in San

24    Diego, sent me the key.  I sent the key back to California,

14:15:53 25    had them take them out.  They have to be sent here.  I need

1   help to go through all that.

2       I can't go through all those documents without knowing

3   where everything is, without being able to access Mr. De

4   Maison to be able to go through the documents.  He has no

14:16:09  5   ability to defend himself here or in the case in New York

6   without being able to even get to them.

7       He has pledged to -- he's not looking to hide

8   anything.  He's not looking to -- he's going to agree with

9   restrictions you can have.  There is -- I think that the

14:16:31 10   hearing today will not show he's a flight risk and will not

11   show he's a danger to anyone.  But, more importantly, he'll

12   be able to work with everybody to explain a whole lot of

13   things that he can't do without the ability to access

14   documents and without the ability -- sitting in that

14:16:48 15   facility in Youngstown because he can't even sit there and

16   go through the documents.

17       We'll hear what the Government has to say.  I just saw

18   these exhibits for the first time.  My client has seen them

19   for the first time.  One of them I know what it is already,

14:17:04 20   and I can deal with that, and we'll deal with it as best we

21   can, but we think that what we've offered the Government and

22   your Honor is a reasonable solution that solves all the

23   problem.

24                   THE COURT:  Very good.

14:17:18 25                   MR. FELLHEIMER:  I'll listen to their case.

1          THE COURT:  Thank you.

2          And, Mr. Georgalis, has the Government complied with

3     the notification requirements here today?

4               MR. GEORGALIS:  Yes, Judge.

14:17:27  5               THE COURT:  Very good.  And no one's present.

6               MR. GEORGALIS:  Well, it's unclear to me.  If

7     I will -- appears there is family victims here, Judge.

8               THE COURT:  Very good.

9          You may proceed, sir.

14:17:38  10               MR. GEORGALIS:  Thank you, Judge.

11          As an initial matter we proffer the PSR in this case,

12     and we call Special Agent Sean McGovern.

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                          SEAN MCGOVERN,

 2           of lawful age, a witness called by the GOVERNMENT,

 3                   being first duly sworn, was examined

 4                         and testified as follows:

 5                  DIRECT EXAMINATION OF SEAN MCGOVERN

 6     BY MR. GEORGALIS:

 7     **Q.**     Thank you, Judge.

 8           Sir, could you please state your full name and spell

 9     your last name for the record?

14:18:08 10    **A.**     Sean McGovern, M-c-G-O-V-E-R-N.

11     **Q.**     How old are you employed?

12     **A.**     Special Agent with the FBI.

13     **Q.**     Just briefly, can you explain the training you

14     received to become a Special Agent?

14:18:19 15    **A.**     Yes, I attended the FBI Academy of Quantico, Virginia,

16     which is roughly five months.

17     **Q.**     And what unit or what type of cases do you work as a

18     Special Agent?

19     **A.**     Currently on the White Collar Crime Squad.  I hold a

14:18:34 20    certified public accountant's license in the State of Ohio

21     as well.

22     **Q.**     Okay.

23           Approximately how many cases have you investigated in

24     the white collar crime area since being a Special Agent?

14:18:43 25    **A.**     Between two or three dozen I would say.

1    **Q.**    Okay.

2           Now, you are the lead agent in a case involving the

3    Defendant here, sir, De Maison?

4    **A.**    Yes, I'm one of two agents.

14:18:52  5    **Q.**    Okay.

6           So we're here for purposes of detention here.  And so

7    I'm going to ask you a couple questions related to the

8    Defendant's risk of flight.

9           Is that your understanding?

14:19:03  10    **A.**    Yes.

11    **Q.**    As an initial matter, can you explain to the Court the

12    Defendant's citizenship?

13    **A.**    Yes, the Defendant is a permanent legal resident or

14    green card holder.  I believe he married an individual here

14:19:15  15    in the United States.  He is a citizen of South Africa and

16    holds a passport out of South Africa.

17    **Q.**    Does he also hold any type of citizenship with the

18    United States?

19    **A.**    I don't believe so.

14:19:26  20    **Q.**    He's not a US citizen?

21    **A.**    No.

22    **Q.**    Have you had a chance to review any records regarding

23    the Defendant's international travel?

24    **A.**    Yes, I have.

14:19:34  25    **Q.**    Let me direct your attention to what has been marked

1    for identification as Government's Exhibit Number 1.

2         It should be there in front of you.

3    **A.**    Yes.

4    **Q.**    Take a look at that.  Do you recognize that document?

14:19:44 5    **A.**    Yes, I do.

6    **Q.**    What is it?

7    **A.**    It's the document received from Customs and Border

8    Protection.

9              MR. FELLHEIMER:  I'm sorry, your Honor.

14:19:50 10    I'm --

11              THE COURT:  That's the extent of your

12    technical ability.

13              THE WITNESS:  I'll do my best.

14    **Q.**    Take a look at what's been marked as Government's

14:21:14 15    Exhibit Number 1.  Do you recognize that document?

16    **A.**    Yes, I do.

17    **Q.**    What is it?

18    **A.**    This is a document received from Customs and Border

19    Protection, regarding the international travel of

14:21:22 20    Mr. Engelbrecht.

21    **Q.**    And is there a date range associated with this

22    document?

23    **A.**    Yes, there is.

24    **Q.**    And what is that date range?

14:21:29 25    **A.**    The beginning date range is December 2006, and this

1    goes through December 18th of 2013.

2    **Q.**    Okay.  So this records the Defendant's international

3    travel for a period of about seven years or so?

4    **A.**    That's correct.

14:21:42  5    **Q.**    Up until December 2013.

6          Now, prior to your testimony here today, did you have

7    a chance to review this document and study it?

8    **A.**    Yes, I did.

9    **Q.**    And what could you explain to the Court in terms of

14:21:55 10    what you found regarding the Defendant's travel?

11    **A.**    In reviewing these records, I determined that the

12    Defendant traveled internationally 102 times between -- in

13    the noted time period.  As noted on the exhibit, the two

14    columns on the right list where the international travel was

14:22:12 15    from and to.

16          And these instances are only travel out of the United

17    States and back in, not between international countries.

18    **Q.**    Okay.  So for purposes of the record, could you just,

19    going down the column regarding from and to, just give us a

14:22:27 20    sense of where this Defendant has traveled?

21    **A.**    In my review, generally I noted Chile was an often

22    visited country.  As well as Mexico.  There were a number of

23    travels earlier in 2010 and 2009 to Paris, France as well.

24    There are also a number of travels to Turks Caicos.

14:22:50 25    **Q.**    To be fair, one of the Defendant's reported businesses

1    was in the country of Chile, correct?

2    **A.**    Two of them, that's correct.

3    **Q.**    Okay.

4         Now, so with respect to how the Defendant travels, did

14:23:04  5    your investigation reveal any instances when the Defendant

6    used multiple names in his travels?

7    **A.**    Yes, it did.

8    **Q.**    And could you sort of give us some color on that?

9    **A.**    Yes, as a result of the investigation, we contacted

14:23:18 10    Customs and Border Protection and enabled them to track any

11    time Mr. Engelbrecht traveled out of the country.  We

12    provided them with Mr. Engelbrecht's aliases and were to be

13    notified when there was international travel.

14         In July of 2014, we received notification that he

14:23:37 15    traveled from Vancouver to the United States.  We had not

16    been notified he traveled out of the United States for the

17    initial trip.

18         When we inquired with Customs and Border Protection,

19    they told us he had traveled out of the country under the

14:23:48 20    name Zirk, Inc. and traveled into the country under the name

21    Zirk De Maison.

22    **Q.**    Okay.

23         So the Defendant here has at least two aliases or

24    names that he uses for purposes of international travel

14:24:01 25    among other reasons?

1    **A.**    That's correct.

2    **Q.**    Let me direct your attention to what's been marked as

3    Government's Exhibit Number 2, if I could.

4         You see that in front of you?

14:24:09  5    **A.**    Yes, I do.

6    **Q.**    Take a second to look at that.

7    **A.**    Okay.

8    **Q.**    Do you recognize that document?

9    **A.**    Yes, I do.

14:24:16  10    **Q.**    And what is that document?

11    **A.**    This was a photograph of the documents provided to the

12    Customs and Border Protection agent in Vancouver upon Mr. De

13    Maison's return from Vancouver to the United States.  The

14    agent took a picture of the documents that were provided to

14:24:32  15    them upon reentry into the United States.

16    **Q.**    And what are some of the documents that we see

17    pictured here in Government's Exhibit 2?

18    **A.**    Yes, at the top is the Defendant's South Africa

19    passport.  The first item to the last is the Defendant's

14:24:47  20    Social Security.

21    **Q.**    Let me back up.  Could you be specific as to the name

22    associated with each document?

23    **A.**    Absolutely.

24         Listed on the South African passport is the name Izak

14:24:57  25    Zirk, Inc.  On the Social Security card, the name listed is

1    Izak Zirk De Maison.  Below that is the United States

2    permanent resident card.  The name listed is Izak Z.

3    Engelbrecht.  There is a business card for Sulfatos,

4    Limited.  The name provided is Zirk De Maison.  A California

14:25:19  5    driver's license under the name Izak Zirk De Maison.

6    **Q.**    So these are various documents that the individual

7    Defendant here presented to the Customs and Border

8    Protection folks?

9    **A.**    That's correct.

14:25:33 10    **Q.**    Okay.

11          And in this specific instance, you learned that the

12    Defendant flew out of the country using one name, and you

13    received no notification of his --

14                MR. FELLHEIMER:  Your Honor, I'm going to

14:25:44 15    object to the questions leading, and it's a leading

16    question.

17                THE COURT:  Okay.  Well, this is --

18                MR. FELLHEIMER:  Sorry, sir.

19                THE COURT:  This is a bond hearing.  So we're

14:25:52 20    not going to strictly adhere to the Rules of Evidence.

21                MR. FELLHEIMER:  All right.

22                THE COURT:  Try to get the information we need

23    to make reasonable decisions.

24                MR. FELLHEIMER:  Thank you, sir.

14:25:59 25                MR. GEORGALIS:  Thank you, Judge.

1    **Q.**    And so when he left, you received no notification

2    under using one name, correct?

3    **A.**    That's correct.

4    **Q.**    This is more of a summary, this is what you testified

14:26:07  5    to?

6    **A.**    Yes.

7    **Q.**    But then, when trying to come back into the country,

8    he utilized a different name?

9    **A.**    That's correct.

14:26:13  10   **Q.**    Now, what was the length of this trip in July of 2014?

11   **A.**    I believe it was in the same date or within two days.

12   **Q.**    There's -- there was -- can you explain that?

13   **A.**    I believe it was the same day trip.  My understanding

14   he traveled out on, I believe it was July 20th and returned

14:26:28  15   on that same day.

16   **Q.**    Okay.

17   **A.**    It may have been over an overnight trip.  I'm not

18   entirely correct.

19   **Q.**    So for purposes of a one or two-day trip, the

14:26:37  20   Defendant is using two different names; one to leave and one

21   to come back?

22   **A.**    That's correct.

23   **Q.**    Now --

24            THE COURT:  Mr. Georgalis, we could just

14:26:43  25   temper down the leading questions a little bit.

1          MR. GEORGALIS:  Okay.  Thanks, Judge.

2    **Q.**   Now, did your investigation reveal anything about any

3    money or funds that the Defendant might have overseas?

4    **A.**   Yes, it did.

14:26:55  5    **Q.**   And could you explain to the Court just generally what

6    you learned?

7    **A.**   Yes.

8          In receiving bank records from Grand Jury subpoenas,

9    we received a number of company bank accounts that either

14:27:06  10   Mr. Engelbrecht or his wife controlled, and we noted a

11   number of international wire withdrawals to Switzerland in

12   those accounts.

13   **Q.**   With respect to -- even the documents aside, with

14   respect to interviews of witnesses involved in this case

14:27:27  15   that had a relationship with the Defendant, did you come to

16   any other countries where the Defendant sends money?

17   **A.**   Yes, in interviewing one witness, the individual

18   stated that she was told by Mr. Engelbrecht's wife that the

19   family had hid money in Switzerland, in France, and in

14:27:47  20   Panama.

21          MR. FELLHEIMER:  Your Honor, that's not

22   hearsay that's double hearsay.

23          THE COURT:  I understand.  But, again --

24          MR. FELLHEIMER:  I just want to point it out

14:27:54  25   to the Court that that's hearsay on hearsay.

| | |
|---|---|
| 1 | THE COURT:  I've heard hearsay before.  Got |
| 2 | it.  Thanks. |
| 3 | MR. FELLHEIMER:  And I'm sure the Court can -- |
| 4 | has the ability to -- |
| 14:28:02 5 | THE COURT:  I'll sort through it. |
| 6 | MR. FELLHEIMER:  -- give it the proper weight. |
| 7 | BY MR. GEORGALIS: |
| 8 | Q.   Now if I could turn your attention to what's been |
| 9 | marked as Government's Exhibits 3, 4 and 5, they should be |
| 14:28:12 10 | there in front of you.  Do you see them there? |
| 11 | A.   Yes, I do. |
| 12 | Q.   What do you -- could you take a second to review them? |
| 13 | A.   Thanks. |
| 14 | Q.   Do you recognize these documents? |
| 14:28:23 15 | A.   Yes, I do. |
| 16 | Q.   What are they? |
| 17 | A.   These Exhibits 3, 4 and 5 are bank accounts for the |
| 18 | JPMorgan Chase account for Bridges Investments.  This is a |
| 19 | company that was owned and controlled by the Defendant's |
| 14:28:36 20 | wife Angelique De Maison. |
| 21 | MR. FELLHEIMER:  Sorry.  I didn't hear that. |
| 22 | THE COURT:  Would you repeat the answer. |
| 23 | THE WITNESS:  Yes, judge. |
| 24 | MR. FLLHEIMER:  Just louder. |
| 14:28:44 25 | THE WITNESS:  Exhibits 3, 4 and 5 are JPMorgan |

1  Chase bank account records for the Defendant's wife's

2  company, Bridges Investments, Incorporated.  The three

3  exhibits are for A time period over three months in 2011.

4  **Q.**  Okay.

14:28:59  5  Now, did you get a chance to review these records

6  prior to your testimony here today?

7  **A.**  Yes, I have.

8  **Q.**  And what did you find with respect to international

9  transfers in these records?

14:29:09  10  **A.**  As noted on Page 3 of each exhibit, there is an online

11  wire transfer withdrawal to an account in Zurich,

12  Switzerland as marked in Exhibit 3, Page 3.  The reference

13  line is from Angelique De Maison, and the wire transfer is

14  the amount of $25,000.

14:29:29  15  **Q.**  And where is that wire going to?

16  **A.**  As it reads, Zurich, Switzerland.

17  **Q.**  And you're getting that straight from the document

18  itself to Switzerland?

19  **A.**  That's correct.

14:29:44  20  **Q.**  In the amount of $25,000?

21  **A.**  Yes.

22  **Q.**  All right.

23  What about with respect to Government's Exhibit Number

24  4?

14:29:56  25  **A.**  Yes, as noted on Exhibit 4, Page 3, there's an online

1     wire transfer withdrawal in the amount of $50,000, and it's

2     going to Zurich, Switzerland.  The reference line reads,

3     "From Angelique De Maison."

4     Q.    And, again, it's going to Zurich, Switzerland?

14:30:15  5     A.    That's correct.

6     Q.    In the amount of $50,000?

7     A.    Yes.

8                    THE COURT: What was the date that that was

9     done?

14:30:19 10                    THE WITNESS:  This is May 5, 2011.

11                    THE COURT:  Okay.

12    BY MR. GEORGALIS:

13    Q.    And what about Government's Exhibit Number 5, do you

14    see any wires going internationally there?

14:30:32 15    A.    Yes, I do.  There are two on Page 3.  Under the

16    section "Electronic Withdrawals."  The first is on June 6,

17    2011, the first -- the first listed as $50,000.  Online

18    transfer to Zurich, Switzerland.  The reference is from

19    Angelique De Maison.  The second on that statement is the

14:30:58 20    third entry in that section, June 16, 2011, online wire

21    transfer to Zurich, Switzerland for $25,000.  And the

22    reference line says from Angelique.

23    Q.    And, again, who is Angelique?

24    A.    The Defendant's wife.

14:31:15 25    Q.    Now, did your investigation also reveal a meeting that

McGovern - Direct

1    took place in Panama between the Defendant and another

2    witness?

3    **A.**    Yes, it did.

4    **Q.**    Could you explain to the Court what was discussed

14:31:34  5    during that meeting?

6    **A.**    Yes.  The Defendant was traveling with a witness that

7    we had interviewed to Chile.  They made a stop in Panama

8    along the way where the Defendant and/or witness met with a

9    tax attorney in Panama, and it was explained to the witness

14:31:51 10    that the purpose of this meeting was to meet with the

11    attorney to determine how the Defendant can reduce his tax

12    liability and hide assets.

13              MR. FELLHEIMER:  I'm sorry.  I'd like to hear

14    that again.

14:32:04 15              THE COURT:  Sure.  Could you repeat that?

16              THE WITNESS:  Sure.  Yes.

17        Our witness had traveled with Mr. Engelbrecht to

18    Chile, made a stop in Panama along the way.  There, the

19    Defendant and the witness met with a tax attorney in Panama,

14:32:22 20    and it was explained to the witness the purpose of this was

21    to reduce the Defendant's tax liability as well as to hide

22    assets.

23              MR. FELLHEIMER:  Okay.  I'll get to that.  My

24    turn.

14:32:34 25    **Q.**    Now, with respect to the Defendant's family, where are

1   they currently living?

2   **A.**    The Defendant's wife and her three children are

3   currently in France.

4   **Q.**    Okay.

5   Now, during the course of your investigation, were any

6   recordings made regarding the Defendant's stated intention

7   to move to France?

8   **A.**    Yes, there were.

9   **Q.**    What's the approximate date of those recordings?

10  **A.**    Primarily there's one in September of 2014.

11  **Q.**    Now, was your investigation of Defendant and his

12  company's overt at the time these recordings were made?

13  **A.**    Yes, it was.

14  **Q.**    And how so?

15  **A.**    In August of 2014, as the Defendant's wife was

16  traveling to France, she was issued a Federal Grand Jury

17  subpoena for her company on the same company we saw under

18  Exhibits 3, 4 and 5, Bridges Investments, Incorporated, and

19  that's when the investigation became overt to the Defendant

20  as well.

21  **Q.**    Now, I have for you what's been marked as Government's

22  Exhibit Number 7, which is a CD containing multiple audio

23  files.

24  I would ask that Mr. Heffernan play the first

25  recording for us regarding the Defendant's intention to move

McGovern - Direct

1    to France.

2                    THE COURT:  I think she's going --

3    Mr. Fellheimer, have you heard these?

4                    MR. FELLHEIMER:  No, I have not.  I've been

14:34:04  5    asked to give -- see them.  I was told -- I haven't heard

6    them.  I haven't seen them.

7                    THE COURT:  Okay.

8        How many do you have, Mr. Georgalis?

9                    MR. GEORGALIS:  It's about a total I think six

14:34:13 10    or seven, very short.  They may be ten seconds each.

11                    THE COURT:  Okay.  Go ahead.

12                    (Tapes played.)

13    Q.    That's kind of difficult to hear over the speakers.

14    Have you had a chance to listen to these beforehand?

14:34:43 15    A.    Yes, I have.

16    Q.    What is it the Defendant is saying regarding his

17    travel?

18                    MR. FELLHEIMER:  Your Honor, those are not --

19    if we can't understand it, how can he --

14:34:54 20                    THE COURT:  He's had an opportunity to review

21    this.  So I mean his testimony probably would be better than

22    the Government's tape.

23        So I'll let him answer the question.  You'll have your

24    opportunity to cross.

14:35:04 25                    THE WITNESS:  Yes, as noted in the audio

1    recording, Mr. Engelbrecht says I just got to pack my bags

2    and be done with it.

3    Q.    Okay.

4              MR. FELLHEIMER:  I didn't hear that.

14:35:14  5    Q.    Can you give us some context as to what was being

6    discussed in this meeting?

7    A.    Yes, prior to that meeting, Mr. Engelbrecht had

8    contacted two --

9              THE COURT:  Could you back up and start over

14:35:24  10    about this meeting?  When was it, where was it, who was

11    there?

12              THE WITNESS:  Yes, sir.

13              THE COURT:  That would be helpful.

14              THE WITNESS:  Meeting held in September of

14:35:32  15    2014, meeting arranged by Mr. Engelbrecht following the

16    issuance of the subpoena I mentioned before.  In the

17    subpoena, we identified certain brokers, investment brokers,

18    whom we wanted additional records for.  Mr. Engelbrecht then

19    contacted two of those individuals to set up a meeting that

14:35:52  20    in his words were to get the story straight.  And this

21    meeting was held in person between Mr. Engelbrecht and two

22    other individuals on September -- in early September of

23    2014.

24    Q.    And that was at a restaurant, is that what you said?

14:36:08  25    A.    I didn't, but that is correct.

McGovern - Direct

1          MR. FELLHEIMER:  I'm sorry.

2          THE WITNESS:  The meeting was held at a

3    restaurant which is where the noise --

4          THE COURT:  I'm sorry?

14:36:16  5          MR. FELLHEIMER:  Did he say who?

6          THE COURT:  Who was at the meeting?  He said

7    two people that had been subpoenaed for the investigation, I

8    think is the answer.

9          THE WITNESS:  I'll clarify, Judge.  It was two

14:36:26 10   people that were listed on the attachment to the Federal

11   Grand Jury subpoena.  So the subpoena itself was to Bridges

12   Investment, Incorporated.  On the subpoena, we requested

13   records related to two individuals, and it was those two we

14   met with --

14:36:38 15   Q.   Okay.

16         And I believe there's another recording regarding the

17   liquidation of assets.  And it might be better for you to

18   kind of let us know what he stated.

19   A.   Absolutely.  This recording was from August of 2014.

14:36:52 20   In it, the Defendant discusses his recent liquidation of, I

21   believe, two or maybe three vehicles that he had just sold.

22   And he -- in the recording, it references -- he's keeping

23   his Cadillac, and he's leasing it.

24   Q.   Okay.

14:37:08 25         I'd also like to discuss with you your knowledge of

1     what assets the Defendant has in this district, in the

2     Northern District of Ohio, tying into this district.

3     **A.**     I'm not aware of any assets the Defendant has in this

4     district.

14:37:24  5     **Q.**     Okay.

6          And so outside this district, what assets tie him to

7     this -- to the United States?

8     **A.**     Outside of possibly some diamonds at a jewelry shop,

9     I'm not aware of any other assets that tie him to the United

14:37:41 10     States.

11     **Q.**     Now, there is some real property that was listed in

12     the Pretrial Services report in this case.  Who does that

13     property actually belong to?

14     **A.**     Those properties according to the deed are listed to

14:37:52 15     Angelique De Maison, the Defendant's wife.

16     **Q.**     Okay.

17          And what does your investigation reveal just generally

18     about some of those properties?

19     **A.**     Yes.  A number of those properties are in Redlands,

14:38:03 20     California.  Miss -- the Defendant's wife had purchased

21     those from an individual, and I interviewed that -- that

22     individual he purchased it from.  He stated that the

23     Defendant and his wife could not obtain a conventional

24     mortgage on the property.  It was privately financed through

14:38:23 25     this individual.  The purchase price was roughly $3 million,

1    and initially, he had financed $700,000 of it.  After that,

2    money was put into the escrow.  Money was placed, the

3    Defendant requested that money back, and the landlord or the

4    seller had agreed to it under the condition that some

14:38:46  5    collateral be posted.  Mr. Engelbrecht provided stock in

6    some of the companies that he has become associated with

7    over the years as collateral.  Although shares were

8    restricted, meaning they couldn't be traded on the open

9    market, it was just more or less a piece of paper that was

14:39:01  10    held by the seller.

11    **Q.**    Okay.

12         So to the extent there's an argument presented that

13    there's $700,000 equity in this property at 565 Walnut,

14    Redlands, your testimony today is that that there's no cash

14:39:19  15    backing up that property?

16    **A.**    That's my understanding from interviewing the seller.

17    **Q.**    The collateral is just restricted stock?

18    **A.**    Correct.

19    **Q.**    All right.

14:39:26  20         What about with respect to some of the other

21    properties listed in the PSR, did you take a -- did you

22    review sort of the back taxes that are owed in any of those

23    properties?

24    **A.**    I have, yes, and with regard to the four properties

14:39:37  25    that are in Redlands, California, they collectively owe

1    roughly $92,000 in back taxes.  I believe the 565 Walnut

2    address is delinquent from either 2012 or 2013.  I believe

3    it's 2012.

4                THE COURT:  What was the total again?

14:39:54  5                THE WITNESS:  $92,000.

6    **Q.**   Moving on from there, during the course of your

7    investigation, did you learn of any allegations that the

8    Defendant committed or conducted a similar scheme in other

9    countries?

14:40:08 10    **A.**   Yes, I have.

11    **Q.**   What did you learn about that?

12    **A.**   I learned through discussing with witnesses, as well

13    as Open Source review, similar schemes involving stock

14    issuance or stock issuance of companies in the distribution

14:40:23 15    to shareholders occurred in South Africa as well as Libya.

16          I can speak to the scheme generally, if you'd like.

17    **Q.**   Please.

18    **A.**   As I understand it, Mr. Engelbrecht has acquired with

19    regard to these two countries, stock in various companies

14:40:44 20    for very low dollar amounts.  He then resells them to the

21    general public at a significantly increased amount.  As I've

22    come to learn through Open Source, these are typically

23    highly speculative countries, either jewelry or mining.

24          In interviewing one associate of Mr. Engelbrecht, he

14:41:04 25    confirmed that Mr. Engelbrecht told him he was involved with

1    one company in particular, Montrose Mining, which was listed

2    in various Open Source reporting I've seen.

3    **Q.**    Now, you say mining and jewelry were some of the

4    industries involved in some of these international schemes

14:41:20  5    that were alleged.

6         Are those similar industries we're seeing that the

7    Defendant conduct in this scheme conducted in the United

8    States?

9    **A.**    Yes.

14:41:30 10        With regard to the scheme in the United States, the

11   most recent iteration of the companies the Defendant has

12   used was known as Gepco, that is purported to be a jewelry

13   business, and two other companies.

14                  THE COURT:  Could you spell that.

14:41:43 15                  THE WITNESS:  Sure, G-E-P-C-O.  And two other

16   companies, one being Casablanca Mining, and Lustros,

17   L-U-S-T-R-O-S, both in the mining or copper sulfate

18   industry.

19   **Q.**    Are you familiar with the company Super Thin and

14:42:07 20   Sunaco?

21   **A.**    Yes, I am.

22   **Q.**    What are those companies?

23   **A.**    Those are companies that are controlled by the

24   Defendant, Mr. Engelbrecht.

14:42:12 25   **Q.**    And were those companies used as part of the scheme in

1    the allegations contained in the complaint in this case?

2    **A.**    Yes, they are.

3    **Q.**    And were they also companies that were used in

4    allegations internationally?

14:42:26  5    **A.**    According to Open Source reporting I've seen, yes,

6    they have been mentioned as well.

7    **Q.**    Okay.

8         I'd also like to talk to you regarding the danger to

9    the community that the Defendant poses both physically and

14:42:38  10   economically.

11        During the course of your investigation, did you come

12   across any instances of threats the Defendant made to any

13   potential witnesses in this case?

14   **A.**    Yes.

14:42:48  15   **Q.**    Can you kind of set that up for us, please?

16   **A.**    Yes.

17        The first would be a written threat that I encountered

18   or I witnessed in discussing with one witness who was the --

19   an officer at multiple of companies that Mr. Engelbrecht was

14:43:06  20   associated with.  This individual was, I believe, either

21   fired or let go.

22        Mr. Engelbrecht then requested an accounting of the

23   funds that were used in that company, and this was all

24   through, you know, correspondence.  And in that e-mail,

14:43:22  25   there were -- there were threats made.

          1              MR. FELLHEIMER:  Are you describing the

          2      background to Government's Exhibit Number 6?

          3              THE WITNESS:  Yes, I am.

          4              MR. FELLHEIMER:  Excuse me.  Did you say that

14:43:31  5      was Exhibit 6?

          6              THE WITNESS:  I'm referring to Exhibit 6.

          7              MR. FELLHEIMER:  Thank you.

          8              THE COURT:  Do you have that, Mr. Georgalis --

          9      Mr. Georgalis, do you have Exhibit 6?

14:43:38 10              MR. FELLHEIMER:  I just --

         11              MR. GEORGALIS:  They have it, Judge.

         12              THE COURT:  Okay.

         13          And the date of the purported threat is what, Special

         14      Agent?

14:43:46 15              THE WITNESS:  The dates of this e-mail are

         16      January 30, 2014, and January 31, 2014.

         17      Q.   And who was the witness in this case?

         18      A.   As listed on the e-mail, Gonzo Troncoso.

         19              MR. FELLHEIMER:  Sorry.  I didn't hear the

14:44:01 20      question or answer.

         21      Q.   The question was who was the witness that was being

         22      threatened in this case?

         23              THE WITNESS:  My answer was Gonzo Troncoso,

         24      name listed on Exhibit 6.

14:44:12 25      Q.   Now, could you read into the record the threat?  Did

McGovern - Direct

1    you see it?

2    **A.**    Yes.

3         First I'll generally summarize the initial e-mail

4    as --

14:44:22  5              MR. FELLHEIMER:  I can't understand what

6    you're saying.

7              THE WITNESS:  I'll first initially summarize

8    the content on Pages 2 and 3, which is the initial e-mail

9    from the Defendant to Mr. Troncoso.  The Defendant is -- the

14:44:39  10   Defendant is requesting an accounting of funds for the

11   company that's at issue here.  That's more or less the

12   content of the initial e-mail from the Defendant to the

13   witness.

14        The witness then makes a kind of general reply to the

14:44:58  15   Defendant, and as listed on Page 1, the Defendant has a

16   response, which I'll read.  "Gonsolo, I will not participate

17   in this fucking circus.  I want to know what you did with

18   the money I sent to Chile.  End of fucking story.  You have

19   no idea how I deal with people that have stolen from my

14:45:15  20   family.  Send me a clear cash book analysis on how you

21   pissed this money away, or you will have much more to deal

22   with me than me being pissed at you.  Don't e-mail unless

23   it's a penny-by-penny explanation.  Once we've seen exactly

24   what happened with the money and understand why you did in

14:45:30  25   Chile what you did, we'll talk about the rest.  Gonsolo, you

1    are not going to fuck me, and I will not fuck you, but if

2    you have fucked me, I will never stop."

3    **Q.**    And the last line?

4    **A.**    "Right now I believe you have fucked me."

14:45:43  5    **Q.**    Okay.

6         Now, in addition to this e-mail, do you also have

7    recordings of threats that the Defendant is making to

8    potential witnesses?

9    **A.**    Yes, I do.

14:45:51 10    **Q.**    Could you provide some background to some of the -- to

11    those recordings?

12    **A.**    Yes.

13         The Defendant was involved in a company known as

14    Wealth Makers.  This company, as I understand it, traded in

14:46:03 15    stocks on the stock market.  They also took investor money

16    in.

17              THE COURT:  This is going to go beyond

18    G-rated, use some initials.  We have young spectators here.

19              THE WITNESS:  Sorry about that.

14:46:16 20              MR. FELLHEIMER:  Sorry?

21              THE COURT:  I was asking him to clean the

22    language up.

23              THE WITNESS:  I don't think I'll have any more

24    going forward.

14:46:21 25              THE COURT:  Thanks.

          1              THE WITNESS:  Company, Wealth Makers, raised
          2     money from investors, and it's my understanding that the
          3     investors saw little to no return of that money.  The
          4     investors had collectively gotten together and contacted an
14:46:37  5     attorney with the intent of filing a lawsuit.
          6          That attorney then sent a letter to the Defendant and
          7     his wife notifying them of the possible pending civil
          8     lawsuit.  Upon receiving that letter, the Defendant placed a
          9     phone call to a witness whom he believed had provided that
14:46:56 10     attorney and the investors information about the use of
         11     those funds.
         12     Q.   Okay.  Now, do we have those recordings here?
         13     A.   Yes, we do.
         14     Q.   And those were -- I think you said June, 2014?
14:47:09 15     A.   That's correct.
         16     Q.   Why don't we try playing them and see the quality of
         17     them.  And if it's too difficult to hear, maybe you can
         18     summarize them for us.
         19              MR. FELLHEIMER:  I object, your Honor.
14:47:19 20              THE COURT:  On the grounds?
         21              MR. FELLHEIMER:  Well, I mean he's
         22     summarizing -- can we hear it?
         23              THE COURT:  Yeah, we're going to hear it.  See
         24     if we can hear it.
14:47:29 25              MR. FELLHEIMER:  He asked him to summarize I

McGovern - Direct

1    thought.

2              THE COURT:  He's going to play it first and

3    see if it's legible.  The Government's recording equipment,

4    is that what we're talking about?

14:47:37  5              THE WITNESS:  Yes, Judge.

6              MR. GEORGALIS:  Judge, there is a curse word

7    in one of the recordings.

8              THE COURT:  A what?

9              MR. GEORGALIS:  A swear word in one of the

14:47:44 10    recordings.

11              THE WITNESS:  Actually two of them.

12              MR. GEORGALIS:  And I think -- sounds like

13    it's okay.  Could we have a minute, Judge?

14              THE COURT:  We're not all adults here is what

14:47:54 15    I was referring to.

16              MR. GEORGALIS:  Okay.  Play the recordings,

17    please.

18         (Tape played.)

19              MR. GEORGALIS:  Keep going.

14:48:25 20         (Tape played.)

21    Q.   Do you recognize the voice in all those recordings?

22    A.   Yes, I do.

23    Q.   Okay.  And for purposes of the record, could you just

24    summarize some of the things that he was saying?

14:49:34 25              MR. FELLHEIMER:  Your Honor, I felt we could

1     understand that just fine.

2                     THE COURT:  Okay.  I'll let him testify.  You

3     can cross.

4                     THE WITNESS:  Should I?

14:49:43   5     **Q.**    Yeah.  None of that goes on the record.  So if you

6     could just put on the record some of the things that were

7     being said in those.

8     **A.**    Yes, yes.

9           Generally, the Defendant, Mr. Engelbrecht, said be my

14:49:51 10     enemy is a wrong decision.  He mentioned he had a cheap and

11     totally ethic-less lawyer who will keep going as long as he

12     pays him a thousand bucks a week.  He stated he will do

13     unethical things to you, referring to the witness in this

14     case.

14:50:06 15                     MR. FELLHEIMER:  Do what?

16                     THE WITNESS:  He said he would do unethical

17     things to you, and I believe he was referring to the

18     witness, the potential witness in the civil case.

19           He mentioned that he's not some imbecile who doesn't

14:50:19 20     know how to protect himself, and finally said, "I'm not

21     threatening you.  I'm promising you if my wife's name is

22     dragged through the mud, I'm fucking attacking you."

23     **Q.**    Now, with respect to the economic danger that the

24     Defendant poses to the community if he's released on bond,

14:50:35 25     do you believe that he's an economic danger?

1    **A.**    Yes, I do.

2    **Q.**    Why do you believe that?

3    **A.**    With access to a phone or a computer or both, the

4    Defendant can self stock at will.

14:50:46  5        Through, you know, review of the case, I've seen that

6    he has rarely traded stock or placed money in his own name.

7    Often it's in the name of nominee companies or other persons

8    in an effort to hide assets.

9    **Q.**    And the danger of the Defendant trading in stock to

14:51:06 10    the community is what?

11    **A.**    The base of our case is the companies have limited,

12    some of the companies have limited operations.

13        MR. FELLHEIMER:  I can't hear conditions.

14        THE WITNESS:  Some of the companies have

14:51:15 15    limited operations.  The stock has been manipulated through

16    various means, and it -- we'd argue that it's at inflated

17    prices that the public should not pay for.

18    **Q.**    Okay.

19        Let me change directions here.  I'd like to talk to

14:51:30 20    you a little bit about the weight of the evidence in this

21    case.

22        Could you explain to the Court what some of the

23    evidence is that you have against the Defendant as it

24    relates to the allegations in the complaint?

14:51:40 25    **A.**    Yes.  I think the microphone's back on, by the way.

1    So.

2              THE WITNESS:  Generally, we have e-mails

3    between the Defendant and other coconspirators discussing

4    commission payments to investment brokers.

14:51:57 5      Typically as our case unfolded, we determined those

6    commissions were undisclosed to the clients themselves.

7    We've seen e-mails from the Defendant directing controllers

8    or chief financial officers to make commission payments to

9    those brokers.  We have e-mails in which there are incorrect

14:52:21 10   attestations as to the use of --

11             MR. FELLHEIMER:  Incorrect what?

12             THE WITNESS:  Incorrect attestations as to the

13   use of investor money.

14   **Q.**   Misrepresentations?

14:52:29 15  **A.**   Misrepresentations.  That's a better word, yes.

16   **Q.**   What about tax messages?  Do we have text messages

17   where the Defendant is either accepting or receiving?

18   **A.**   Yes, we do.

19             MR. FELLHEIMER:  What was the question?

14:52:41 20  **Q.**   Text messages, do we have any text messages that the

21   Defendant is either sending or receiving to support the

22   allegations in the complaint?

23   **A.**   Yes, we do.

24   **Q.**   Can you give us a sense of what those text messages

14:52:52 25  say?

1    **A.**    Yes.  Generally those text messages are to coordinate

2    match trades in which the Defendant or one of his

3    coconspirators is looking to sell stock and he will notify a

4    coconspirator about the number of shares and the dollar

14:53:06  5    amount in order to benefit each other.

6         We have text messages regarding market to close, which

7    is where they'll coordinate a purchase or self stock at the

8    end of the day in order for increase the stock price of that

9    particular stock.

14:53:20  10        We have text messages noting match trades in which

11   trades are made between accounts, but there's no change in

12   beneficial ownership of that underlying stock.

13   **Q.**    And how are match trades and market-to-close, how are

14   they in furtherance of the scheme?

14:53:37  15   **A.**    It was part of the conspiracy to increase the stock

16   value, increase the price of the underlying stock as well as

17   to liquidate the Defendant and his coconspirators' shares of

18   the underlying stocks.

19   **Q.**    What about recordings in this case?  We've heard seven

14:53:54  20   or so of them today.  How many recordings or attempted

21   recordings do we have with circumstance and other

22   conspirators in this case?

23   **A.**    There are approximately 250 combined recordings or

24   attempted recordings.

14:54:06  25   **Q.**    Okay.

1          MR. FELLHEIMER:  Recordings of what?

2          THE WITNESS:  Attempted recordings.

3    **Q.**   An attempted recording is what?

4    **A.**   In which a cooperator places a phone call but not it's

14:54:19 5    received on the other end by another person.

6    **Q.**   Okay.

7          And some of these recordings, what are some of the

8    things that the Defendant, some of the statements the

9    Defendant is making?

14:54:27 10   **A.**   There are discussions regarding commissions to be

11   paid.  There are discussions regarding, as I mentioned

12   earlier, getting the story straight, which was a set up to

13   an in-person meeting that was also recorded.

14   **Q.**   The last thing I'd like to discuss with you, Special

14:54:46 15   Agent, is the scale of this fraud here.

16         During the course of the investigation, how many

17   different public companies did you find that the Defendant

18   was associated with and used in furtherance of a scheme?

19   **A.**   I believe between nine and ten.  There might have been

14:55:01 20   more depending on how far we go back.

21   **Q.**   These are all public companies?

22   **A.**   Yes, they are.

23   **Q.**   And in terms of numbers of shares that the Defendant

24   issued himself in nominees of him, how many shares are we

14:55:13 25   talking about?

McGovern - Cross

1    **A.**    Tens of millions of shares.

2    **Q.**    And in terms of net proceeds from the sales of these

3    shares as well as any type of private placements, what are

4    we talking about in terms of dollar amounts?

14:55:24   5    **A.**    I would say conservatively, between 30 and $40

6    million.

7    **Q.**    Since when?

8    **A.**    Since 2006, 2007.

9    **Q.**    Okay.  And that's what your investigation reveals as

14:55:36   10   of today?

11   **A.**    That's correct.

12                MR. FELLHEIMER:  I didn't hear the question.

13   **Q.**    That's what your investigation reveals as of today?

14   **A.**    That's correct.

14:55:41   15               MR. GEORGALIS:  No further questions, Judge.

16               THE COURT:  Okay.  Thank you.  Mr. Fellheimer.

17               MR. FELLHEIMER:  May I work from here, sir?

18               THE COURT:  Certainly.

19               CROSS-EXAMINATION OF SEAN MCGOVERN

14:55:50   20   BY MR. FELLHEIMER:

21   **Q.**    Now, let me start with Exhibit 2.  Do you have that?

22   **A.**    Yes, sir.

23   **Q.**    Now, if I understood you correctly, this entire page

24   was taken, I guess, on a fax machine or a copy machine by a

14:56:35   25   border?

1    **A.**    That's my understanding.

2    **Q.**    In Vancouver?

3    **A.**    That's my understanding.

4    **Q.**    And they took them all at one time?

14:56:39 5    **A.**    I believe it was a photograph.

6    **Q.**    So whoever handed these documents to the guard handed

7    all of them, right?

8    **A.**    That's my understanding.

9    **Q.**    So the one at the top is a South African, Republic of

14:56:52 10    South Africa passport; is that right?

11    **A.**    As I read it, yes.

12    **Q.**    And that says Engelbrecht?

13    **A.**    Yes.

14    **Q.**    Then underneath that one is a -- if you read down, I

14:57:03 15    guess from my left.

16    **A.**    I follow.

17    **Q.**    Is a Social Security card?

18    **A.**    Yes, sir.

19    **Q.**    And that says Izak Zirk De Maison, right?

14:57:11 20    **A.**    As it reads, yes.

21    **Q.**    And then at the same time, he gave a card to the right

22    of that for De Maison?

23    **A.**    Yes.

24    **Q.**    And then below that, there's a permanent residence

14:57:23 25    card, right, on the right?

1    **A.**    On the left, yes, there is.

2    **Q.**    Sorry.  On the left -- I'll do it for you.  To my

3    left, and that says Engelbrecht, right?

4    **A.**    As it reads, yes.

14:57:36  5    **Q.**    So -- I'm sorry?

6    **A.**    As it reads, that's what I read.

7    **Q.**    Yeah, reads Engelbrecht, and the one on the right

8    reads De Maison?

9    **A.**    Yes.

14:57:43  10    **Q.**    So at one time, he gave all these documents with all

11    these -- with both of these names to the same border agent;

12    is that right?

13    **A.**    That's my understanding.

14    **Q.**    Thank you.

15    Now, let's look at these Chase documents.  I believe

14:58:07  16    they're Exhibits 2, 3 and 4; is that right?

17    **A.**    3, 4, and 5.

18    **Q.**    3, 4, and 5.  I'm sorry.  Okay.

19    Now, this is an -- all of these are about the same

14:58:26  20    account; is that right?

21    **A.**    Yes, sir.

22    **Q.**    Bridges Investment, Inc., right?

23    **A.**    Yes, sir.

24    **Q.**    And it talks about transfers -- first of all, looking

14:58:42  25    at these transfers, they were all made by Angelique, are

1    they not?

2                    THE COURT:  By whom?

3    **Q.**   Is there anyone on here that says Zirk?

4    **A.**   No, there's not.

14:58:54  5    **Q.**   Is Zirk a signor on this account?

6    **A.**   I'm not aware.

7    **Q.**   Okay.  Do you have any evidence that Zirk is a signor

8    on this account?

9    **A.**   I have a signature card that his wife is a signor.

14:59:06 10    **Q.**   No.  I'm asking is this Defendant a signor on this

11    account?

12    **A.**   No.

13    **Q.**   So this is all an account by someone else to 2011.

14    You have anything any newer than 2011?

14:59:19 15    **A.**   No.

16    **Q.**   You have any with this Defendant's signature on it?

17    **A.**   No.

18    **Q.**   Lets look at Exhibit 1.  Okay?

19        Now, this is a travel list taken from 2006 to 2013,

14:59:41 20    right?

21    **A.**   Yes, December of 2006.

22    **Q.**   I'm sorry.  Really 2007 to 2013 I guess really because

23    it starts at 1231.

24    **A.**   More or less.

14:59:51 25    **Q.**   You have to forgive me.  I just saw these for the

1    first time the last few minutes.

2    **A.**    Sure.

3    **Q.**    He went out of the country once a month, right?

4    **A.**    I didn't estimate the frequency of it.

5    **Q.**    Well, you totalled it how many?

6    **A.**    102.

7    **Q.**    And how many months are there between 2007 and 2013?

8    **A.**    I haven't counted.

9    **Q.**    Well, let's see.  Seven, eight, nine, ten, 13.  We're

10   talking about, you know, six years, and 12 months a year.

11   So, you know, less than -- about once a month?

12   **A.**    I don't think your average is appropriate, given

13   that -- looking at the last one, there's two travels in

14   2007.  So I wouldn't average it.

15   **Q.**    Sometimes he traveled more, sometimes less, right?

16   **A.**    That's fair.

17   **Q.**    And now, Casablanca Mining has a mining operation,

18   doesn't it?

19   **A.**    That's my understanding.

20   **Q.**    And where is it?  Where is it?

21   **A.**    I believe it's in Chile.

22   **Q.**    In Chile.  Okay.

23         And Lustros, you know what they do for a living?

24   **A.**    I believe they are a copper sulfate business.

25   **Q.**    Let's talk about that business.  They have copper

1    sulfate mines, is that true?

2    **A.**    That's my standing from the investigation.

3    **Q.**    And they built a plant, a copper sulfate plant, did

4    they not?

15:01:03  5    **A.**    Again, that's my understanding from the investigation.

6    I haven't seen it.

7    **Q.**    You didn't go down and look at it?

8    **A.**    Unfortunately, no.

9    **Q.**    But, you've been told about it, have you not?

15:01:11 10    **A.**    That's correct.

11    **Q.**    And, in fact, that plant just opened in the last year

12    or so, didn't it?

13    **A.**    I wouldn't know.

14    **Q.**    Okay.

15:01:18 15         Do you know what they do in that plant?  Do you know

16    what copper sulfate is for?

17    **A.**    My understanding, some type of food grade additive.

18    **Q.**    No.  Actually, would it surprise you to learn --

19                  MR. GEORGALIS:  Objection.

15:01:31 20                  MR. FELLHEIMER:  Copper sulfate is a major --

21    is one of the only sources of both fertilizer and gun

22    powder.

23                  THE WITNESS:  Would it surprise me?

24    **Q.**    Yeah.

15:01:43 25    **A.**    I suppose I don't know much about it.

1    Q.   And this plant is producing copper sulfate, is it not?

2    A.   I don't know.

3    Q.   Now, Mr. Engelbrecht, Mr. De Maison -- by the way,

4    both names are on the Defendant's -- a number of his trips

15:01:59  5    were down to Chile, were they not?

6    A.   According to this document, yes.

7         MR. FELLHEIMER:  One second, please.

8    Q.   Did you do anything to determine whether or not these

9    were each separate trips, by the way?

15:02:47 10    A.   I believe there are 125 total entries on the spread

11   sheet.  I'd like to finish answering the question.

12   Q.   Just look at the question.

13        THE COURT:  Let him finish.

14        MR. FELLHEIMER:  Sorry.

15:03:00 15        THE WITNESS:  125 entry total lines.  If you

16   go to the column that reads status number, that reads not on

17   board.  I removed those and come to 102, which is what I

18   said earlier.

19   Q.   Did you -- how did you get this document?

15:03:12 20   A.   As I stated earlier, from Customs and Border

21   Protection.

22   Q.   Did you go over it with anybody or they just sent it

23   to you?

24   A.   Just sent it to me.

15:03:21 25   Q.   So you don't have anybody telling you how to read this

1    or whether it could be one trip or more?

2    **A.**    Not reading it based upon how I interpret it.

3    **Q.**    You never discussed this with anybody at border; is

4    that right?

15:03:39 5    **A.**    That's correct.

6    **Q.**    Okay.

7                    THE COURT:  Mr. Fellheimer, can I ask you how

8    challenging the frequency of his --

9                    MR. FELLHEIMER:  Yes, your Honor, we are, my

15:03:49 10    client says some of these -- numerous entries for a single

11    trip.

12                    THE COURT:  Okay.  But, there's no question

13    he's made a significant number of trips.

14                    MR. FELLHEIMER:  Yeah.  He made a lot of

15:04:00 15    trips, but it's a long time, too, your Honor.

16                    THE COURT:  Okay.

17                    MR. FELLHEIMER:  I mean it's not 2014.  You're

18    talking about, you know, between six years.

19                    THE COURT:  I got it.

15:04:08 20                    MR. FELLHEIMER:  I'm not sure, you know, I

21    could pass that test.

22                    THE COURT:  Okay.

23    BY MR. FELLHEIMER:

24    **Q.**    Can I ask you, by the way, what does it mean when it

15:04:28 25    says "not on board"?  Does that mean he didn't go?

1    **A.**    That's my understanding.

2    **Q.**    So some of these trips didn't even happen, a lot of

3    them?

4    **A.**    As I said earlier, there are 125 items listed here.  I

15:04:41  5    removed the ones that said not on board, which were 23.

6    There were 102 left, which is what my testimony was.

7    **Q.**    All right.

8           So, okay.  Let me also -- can you look at the first

9    page?  Just want to make sure we understand.  If you look at

15:05:29 10    the third, the first two entries, it's the same day, and

11    they show him going outbound from, I guess, Dulles, right?

12    DFW, Dallas Fort Worth?

13    **A.**    In bound.

14    **Q.**    Okay.

15:05:51 15           And then you have an outbound trip on the 11th because

16    he went -- he went there on the 11th, came back on the 18th.

17    So you have three entries for one trip; is that right?

18    **A.**    I don't know whether it was one trip or not.  As I

19    read in the "from" and "to" column, it went from LA to Peru

15:06:12 20    and returned from Chile to Dallas Fort Worth.  Those are the

21    consecutive entries.

22    **Q.**    Okay.

23           If he left LA to go to Peru and came back through

24    Dallas Fort Worth, where is SCL?

15:06:28 25                THE COURT:  That's Chile.

McGovern - Cross

1          THE WITNESS:  Chile.

2     **Q.**   I mean if he made a couple stops and came back, it's

3     all one trip, though, isn't it?

4     **A.**   I don't know.

15:06:35   5     **Q.**   You don't know.  So you don't know how many trips this

6     is?

7     **A.**   As I said, there are 125.

8     **Q.**   No.  I'm asking a different question.  Do you know how

9     many trips this is?

15:06:42  10     **A.**   No, I don't.

11     **Q.**   Thank you.

12          You said that you had a witness who said that he

13     stopped in Chile to -- on the way to Chile and Panama to

14     get -- to seek advice from somebody; is that right?

15:07:06  15     **A.**   That's -- yes.

16     **Q.**   Yes.  Who was the witness who told you that?

17               MR. GEORGALIS:  Objection.

18               THE COURT:  Go ahead, Mr. Georgalis, what do

19     you have here?

15:07:16  20               MR. GEORGALIS:  This is a situation where

21     we've heard recordings where the Defendant has threatened

22     witnesses before.  It's not really relevant to the

23     cross-examination of this Defendant who the witness is.

24          The Defendant will be given a list of witnesses when

15:07:29  25     that time is appropriate for purposes of trial preparation

1    and prepares Defense, but it's not relevant I think to this

2    discussion today.

3                    THE COURT:  So this is a confidential source?

4    This is somebody he would know?

15:07:45  5                    THE WITNESS:  Yes.  Yes, Judge.

6                    THE COURT:  So he doesn't know who this person

7    is?

8                    THE WITNESS:  I believe he knows who the

9    person is.

15:07:51 10                    THE COURT:  Then we're going to let you allow

11   your question.

12                    THE WITNESS:  Gonzo Troncoso.

13   **Q.**    The same guy, right, your witness, right, who said

14   that?

15:08:00 15   **A.**    Yes.

16   **Q.**    And he said he stopped in Panama and got some advice?

17   **A.**    He didn't get advice; Mr. Engelbrecht.

18   **Q.**    Mr. Engelbrecht got advice?

19   **A.**    That's my understanding.

15:08:10 20   **Q.**    Did he say who?

21   **A.**    The name of the attorney?

22   **Q.**    It was an attorney?

23   **A.**    Yes.

24   **Q.**    So Mr. Engelbrecht or Mr. De Maison.  The Court, I

15:08:16 25   think, prefers we use De Maison.

1          THE COURT:  Either one you want.  I got it.

2          MR. FELLHEIMER:  Okay.  That was from the last

3    hearing.

4    Q.   Stopped and consulted an attorney and that's somehow

15:08:28  5    wrong, huh?

6    A.   I don't believe I ever said it was wrong.

7    Q.   Let's talk about Mr. Gonzo.  Do you know who he is,

8    not Mr. Gonzo?  The first name is Gonzo.  The last name is

9    Troncoso?

15:08:44 10          You know who he is?

11   A.   I've met with him.

12   Q.   You know what he does for a living?

13   A.   I understand he works for web.com for a period of

14   time, and I believe he was the president of a number of

15:08:53 15   these companies.

16   Q.   Did he work for Lustros?

17   A.   Yes, he did.

18   Q.   He was a president, wasn't he?

19   A.   I believe so.

15:09:06 20   Q.   And there were problems with money moving various

21   places that were alleged about him?

22   A.   That's my understanding from reading the e-mail.

23   Q.   So he and Mr. De Maison were having some differences,

24   were they not?

15:09:22 25   A.   That's implied from the e-mail, yes.

McGovern - Cross

1    **Q.**    By the way, speaking of that, looking at Exhibit 6 for

2    a second, and I want you to tell me which words threaten

3    anybody in Exhibit 6, in your opinion.

4    **A.**    You're asking for my opinion?

15:09:38  5    **Q.**    Yeah, I'll ask your opinion.  Just tell me.  Which

6    word?

7    **A.**    It was a number of sentences.  If you'd like me to

8    read them.

9    **Q.**    Yeah, just tell me which ones threaten any action, any

15:09:49  10    bodily harm or anything to him.

11    **A.**    It says, "You have no idea how I deal with people that

12    have stolen from my family."

13    **Q.**    You think that's a threat?  All right.  But, you think

14    that's a threat?

15:09:59  15    **A.**    Yes.

16    **Q.**    Okay.  What else?

17    **A.**    Sending a clear cash analysis on how you pissed this

18    money away or you will have much more to deal with than me

19    being pissed at you.

15:10:11  20    **Q.**    Could be if he -- if he can't explain where the money

21    went, that means a lawsuit?

22                    MR. GEORGALIS:  Objection.

23    **Q.**    Could it not?

24                    THE COURT:  Overruled.

15:10:18  25    **Q.**    Threatening a lawsuit is what he's talking about?  If

|   |   |   |
|---|---|---|
| 1 |  | he'd play the tape. |
| 2 |  | THE COURT:  Is there a question here? |
| 3 | **Q.** | Yeah.  Could be a lawsuit, could it? |
| 4 | **A.** | Entirely hypothetical. |
| 15:10:29  5 | **Q.** | I'm sorry? |
| 6 | **A.** | What you're saying is entirely hypothetical.  It could |
| 7 |  | be a lot of things. |
| 8 | **Q.** | Right. |
| 9 |  | And the tape even talked about lawsuits, did it not? |
| 15:10:37 10 | **A.** | That was a separate discussion. |
| 11 | **Q.** | Yeah. |
| 12 |  | So, and by the way, in that tape, he said unethical |
| 13 |  | but not illegal, did he not? |
| 14 | **A.** | Are we referring to the e-mail or the tape? |
| 15:10:48 15 | **Q.** | The tape. |
| 16 | **A.** | That's not the same individual who the call was. |
| 17 | **Q.** | In that tape, he said unethical but not legal, didn't |
| 18 |  | he? |
| 19 | **A.** | True but we're in the courtroom. |
| 15:10:59 20 | **Q.** | Is that a correct quote? |
| 21 | **A.** | Yes. |
| 22 | **Q.** | Thank you. |
| 23 |  | Do you have any evidence whatsoever of any account in |
| 24 |  | which Zirk Engelbrecht or De Maison is a signor outside of |
| 15:11:17 25 |  | the United States of America? |

1  **A.**  No.

2  **Q.**  Now, there's a restaurant conversation you told the

3  Court?

4  **A.**  Yes.

15:11:31 5  **Q.**  Where was that taken?

6  **A.**  That was in California.

7  **Q.**  Okay.  And who was present?

8  **A.**  Two witnesses.

9  **Q.**  Who were they?

15:11:40 10  **A.**  One would be confidential source, another one, another

11  individual arrested along with Mr. Engelbrecht, Stephen

12  Wilshinsky.

13  **Q.**  Who was the other person?

14            THE COURT:  We're not going to be naming

15:11:52 15  confidential sources.

16            MR. FELLHEIMER:  Okay.  I'm sorry.

17  **Q.**  And where was that -- what restaurant was that in?

18  **A.**  I don't know.

19  **Q.**  Oh, how do you know about the meet?

15:12:04 20  **A.**  We had a discussion with our source.

21  **Q.**  So he told you and that's how you know?

22  **A.**  Yes.

23  **Q.**  And what did you -- did you talk to both him and to

24  the other person present?

15:12:17 25  **A.**  No, I didn't.

McGovern - Cross

1    **Q.**   So you only have his statement about what took place

2    at the meeting?

3    **A.**   That's correct.

4    **Q.**   Did you do anything to verify it?

15:12:26  5    **A.**   I listened to the recording.

6    **Q.**   And what did the recording say?

7    **A.**   I believe you heard what the recording said.

8    **Q.**   Okay.  I didn't hear on the recording any threats of

9    illegal activity, did you?

15:12:38 10                  THE COURT:  If you could summarize the

11   activity again in answer to his question.

12                  THE WITNESS:  Yes, sir.  The section played

13   was in reference to, "I got to pack my bags and go,"

14   implying the Defendant's going to leave the country.

15:12:47 15   **Q.**   That was the one we couldn't understand, right?

16   **A.**   That's the one I summarized, yes.

17   **Q.**   But, you played it.  We -- could we hear that again?

18                  MR. FELLHEIMER:  Your Honor, I'd like to hear

19   it.  I didn't hear those words.

15:12:59 20                  THE COURT:  Sure, okay.

21       (Tape played.)

22   BY MR. FELLHEIMER:

23   **Q.**   I met you in California.  When was that?

24   **A.**   April.

15:13:23 25   **Q.**   So back in April, Mr. Engelbrecht knew you were

1    investigating him, right?

2    **A.**    I don't think that's a fair statement.  We didn't

3    interview Mr. Engelbrecht.  We didn't attempt to interview.

4    **Q.**    But, you interviewed everything you knew.  Trish

15:13:36  5    Malone, you interviewed Maggie Jamison, you interviewed lots

6    of people in California, did you not?

7    **A.**    We interviewed other people.

8    **Q.**    And I came out because he called me and asked me to

9    come out.

15:13:46 10    **A.**    I believe you said you were representing Maggie

11    Jamison.

12    **Q.**    At the time, yeah.

13    **A.**    Yes.

14    **Q.**    But -- so he knew there was an investigation going on,

15:13:52 15    did he not?

16                        MR. GEORGALIS:  Objection.

17                        THE COURT:  If he can answer it.

18                        THE WITNESS:  I don't believe I can answer it.

19    I don't know the answer to that question.

15:13:57 20    **Q.**    Between April of 2014 and the date that he was

21    arrested, did Mr. Engelbrecht make any attempt to leave the

22    United States of America?

23    **A.**    Yes, he did.

24    **Q.**    When?

15:14:09 25    **A.**    We have the same discussion regarding this Exhibit 2.

1    He went to Vancouver.

2    Q.    And came back?  And came back?

3    A.    Yes.

4    Q.    But, did he make any attempt to leave -- to leave,

15:14:20  5    permanently?  I don't mean to go visit someplace, but to

6    leave.

7                    MR. GEORGALIS:  Objection.

8                    THE COURT:  If he can answer.

9                    THE WITNESS:  I can't answer that question.  I

15:14:27 10    don't know.

11    Q.    Do you know of any attempt to leave and not come back,

12    not go to Canada a day or two and come back but leave and

13    not come back.

14    A.    He wouldn't be here if he left and didn't attempt to

15:14:40 15    come back.

16    Q.    Or if he attempt to leave and not come back?

17    A.    I don't know how to answer that question.

18                    THE COURT:  He's asking if you are aware.

19                    THE WITNESS:  I'm not aware of any, no.

15:14:51 20                    MR. FELLHEIMER:  Thank you.

21    Q.    Now, what -- I don't understand.  Mr. Engelbrecht was

22    getting rid of a car and leasing another car, is that what

23    that was about?

24    A.    My understanding from listening to the phone calls was

15:15:15 25    that he had -- I don't believe he played the audio.  I

1    summarized it.  He had sold two or three vehicles and kept

2    one as a lease.  I believe in the calling reference, it was

3    a Cadillac.

4    **Q.**    Is there some -- something nefarious about reducing

15:15:33 5    the number of cars that one has?

6    **A.**    My understanding, I'm implying -- I would be implying

7    my understanding of the call that he sold those cars, took

8    the proceeds; thus, liquidating assets.

9    **Q.**    But, that could be for a lot of economic reasons,

15:15:47 10    could it not, because of expenses?

11    **A.**    Sure.

12    **Q.**    By the way, were those cars owned or leased?

13    **A.**    I don't know.

14    **Q.**    Okay.

15:16:06 15        So if he was just cutting expenses because income was

16    down or, you know, does that prove anything?

17    **A.**    I don't believe so.

18    **Q.**    Did Mr. Clifford give you any documents with respect

19    to his -- the story told about him in stock?

15:16:43 20    **A.**    No.

21    **Q.**    What did you do to confirm that the story he told you

22    about the registered or unregistered stock was true?

23    **A.**    I have reviewed text messages in which Mr. Engelbrecht

24    notes that Mr. Clifford has 200,000 shares of restricted

15:17:02 25    stock in the company.

1    **Q.**    Anything else, anything to confirm that this was, you

2    know, some kind of collateral for the debt of another kind?

3    **A.**    No.

4    **Q.**    By the way, isn't it true that both Casablanca Mining

15:17:50 5    Company and Lustros have independent Board of Directors?

6    **A.**    I believe so.

7    **Q.**    And isn't it true that Mr. Engelbrecht is not a

8    director of either company?

9    **A.**    Right now?

15:18:02 10    **Q.**    Yes.

11    **A.**    I don't know offhand.

12    **Q.**    And isn't it true that Lustros has its own chairman

13    here in Ohio?

14    **A.**    Again, I don't know offhand.  I believe so, but I

15:18:18 15    don't know offhand.

16    **Q.**    I'm sorry?

17    **A.**    I believe so, but I don't know offhand.

18    **Q.**    And what were revenues for Lustros in 2013?

19    **A.**    I have no idea.

15:18:30 20    **Q.**    What were the revenues for Casablanca Mining in 2013?

21    **A.**    Casablanca Mining has not filed any financials for

22    well over 12 months.  So I'm not sure.

23    **Q.**    When you were talking to all these people, did you ask

24    what the revenues were?

15:18:42 25    **A.**    No.

1    **Q.**   I understand you saying Casablanca Mining passed over

2    files?

3    **A.**   That's right.

4    **Q.**   Is Mr. De Maison an officer or director of Casablanca

15:18:54  5    Mining?

6    **A.**   I don't know.

7    **Q.**   How about Lustros?  Is it current on its funds?

8    **A.**   Offhand, I don't know.

9              MR. FELLHEIMER:  No further questions, your

15:19:17 10    Honor.

11             THE COURT:  Thank you.  Mr. Georgalis?

12             MR. GEORGALIS:  May I have a moment, Judge?

13             THE COURT:  Sure.

14        (Counsel conferring.)

15:19:42 15             MR. GEORGALIS:  No further questions, Judge.

16    Thank you.

17             THE COURT:  You may step down.  Thank you.

18             THE WITNESS:  Thanks, Judge.

19             MR. GEORGALIS:  No further witness, Judge.

15:19:50 20    Thank you.

21             THE COURT:  Okay.

22             MR. FELLHEIMER:  May I have a couple minutes,

23    your Honor, to talk to my client?

24             THE COURT:  Sure.  We can take a recess.  I

15:19:57 25    want to make sure you identify the victim in the courtroom,

1    whether that -- we are going to give that victim an

2    opportunity to address the Court if he wants to.

3              MR. GEORGALIS:  Very good, Judge.

4              THE COURT:  And do you want to do that now or

15:20:10  5    do you want to do it after you have --

6              MR. FELLHEIMER:  I'm sorry.  I can't hear your

7    Honor.

8              THE COURT:  There's a victim in the courtroom.

9    According to the law, he has an opportunity to address the

15:20:19 10    Court.

11              MR. FELLHEIMER:  Mr. Powers?

12              THE COURT:  Yeah.

13              MR. FELLHEIMER:  Yeah, if he wants to address

14    the Court, let him to do so now.

15:20:25 15              THE COURT:  Sir, would you come up to the

16    podium, identify yourself, and I'll give you an opportunity

17    to address the issue of bond.

18              MR. POWERS:  Your Honor, yes.  Jerry Powers,

19    Jerry.

15:20:38 20              THE COURT:  Jerry Powers?

21              MR. POWERS:  Yes.

22              THE COURT:  Could you spell your name, please?

23              MR. POWERS:  J-E-R-R-Y, P-O-W-E-R-S.

24              THE COURT:  Go ahead, sir.

15:20:47 25              MR. POWERS:  Yes, your Honor.

1          The group that Mr. Engelbrecht is with, what they've

2     got is a racket going to where they get you into Casablanca.

3     The stock was $12.  Goes right down to a penny a share.

4     Okay.

15:21:02  5          What they do is dump the shares, Mr. De Maison and

6     Zirk do that.  You'll see that they dump their shares and

7     said that there was probably eight or ten companies that

8     they have that they work with.  There's actually about 30

9     that I've counted, okay, that have been delisted or they're

15:21:22 10    worthless.

11          Casablanca is worthless.  Lustros is worthless.  What

12     happened to me was Cancun was also listed in the lawsuit.

13     Zirk Engelbrecht entered into an agreement with them to put

14     shares on me.

15:21:38 15         So what they did is they told me Tom Long was on the

16     phone.  He was the president of the company.  And Zirk was

17     the president when I bought the shares.

18                    THE COURT:  Which company?

19                    MR. POWERS:  Pardon?

15:21:51 20                    THE COURT:  What company?

21                    THE WITNESS:  Casablanca.

22                    THE COURT:  Okay.

23                    MR. POWERS:  He was president of the company.

24          And anyway, all he see that his wife was selling

15:21:59 25    shares, and then during her selling of shares, okay --

|   |   |
|---|---|
| 1 | THE COURT:  Whose wife? |
| 2 | MR. POWERS:  Zirk Engelbrecht. |
| 3 | THE COURT:  Okay. |
| 4 | MR. POWERS:  Okay. |
| 15:22:07  5 | She's gifted all these shares about him.  So 90 |

percent of the shares belong to the insiders.  What they do
is get Cancun like small cap resources to go out and push
the shares to say that it's $25 stock.  They have gold and
all this.  If you take a look at the revenues, it's only
like 30,000 for the year.  Okay.

They pushing this as a $12 stock and they pushing as a
$2 stock.  The stock is worthless, and what they do is dump,
all the insiders dump them.  I lost, okay, with their group
over a half million, okay.  Of the people that they work
with was Zirk, especially with just Casablanca, $250,000.

THE COURT: Okay.

MR. POWERS:  And Zirk then threatened me,
okay, saying if I ask for my money, okay, what he was going
to do.  He was going to sue me for extortion.

I said Mr. Engelbrecht, go ahead.  And he sue me for
extortion.  I guess his attorney that they talk about, which
is Mr. Kenneth Deed, okay, who doesn't really have any, more
or less, okay, he pays him a thousand dollars, okay, every
once in a while.  And he had him send me to California
court, in federal court, okay, for extortion for asking for

1    my money back.

2         And Mr. Engelbrecht sent me an e-mail saying we'll see

3    who laughs last okay, okay, said that to me on the phone,

4    too.  Sent me an e-mail that says we'll see who has the last

15:23:39 5    laugh or something like that.  And when this is all done,

6    they have that e-mail.

7         Then what he did was -- I tried to get an attorney.  I

8    called about 30 attorneys.  I couldn't get an attorney to

9    take the case.  And because they said even if they won, what

15:23:57 10   these guys in the background, they would just move the money

11   out of the country.  So even if you won, Jerry said it would

12   cost you six figures, okay, in a federal court.  And they

13   said -- and they take the money and run.

14        Because what they said is they go and take their money

15:24:15 15   between Russia, France, and move it around the country.  And

16   that's what you heard here today; moving money out of the

17   country.  Okay.

18        So then what they do is put me through seven months of

19   trial, and Mr. Fellheimer is also part of that.  He came

15:24:30 20   into the lawsuit.  This is malicious prosecution, okay,

21   against me in the California court.  Okay?

22        And I told Mr. Fellheimer here that I'm going to sue

23   him for malicious prosecution because he came in and he said

24   that not unless I file something.  He kept filing, and I let

15:24:48 25   him know under Rule 11, you have all the information.  This

1     is a fraudulent --

2              THE COURT:  Mister --

3              MR. POWERS:  -- case against me.  Okay?  And

4     you brought for seven months against me while I was ill.

15:25:00  5     Okay?  I had heart problems, and these guys knew it and they

6     continued for seven months.  I had to go pro se.  Okay?

7         They've taken the money away from my children, their

8     future, and everything.  I don't want this man to get out of

9     jail.  I want him to go to jail.  Right now the whole

15:25:16  10    system, this guy is worse than Bernie Madoff.  He was above

11    the radar screen.  He's below.  Nobody can sue okay, him,

12    because no attorney will take the case, because you can't

13    take a case against a crook that hides money.  Okay.

14        And that's been my problem.  Okay?  And like I say,

15:25:40  15    he's ruined my life, my future for my kids.  He's taken all

16    my retirement savings.  Okay.  And Mr. Fellheimer is also

17    part of that problem with Kenneth and Fellheimer coming

18    against me.  Both attorneys were coming after me in the

19    California law lawsuit for extortion.  I said if it's

15:26:04  20    extortion, let's go ahead and do it.  I want a jury trial.

21        Well, all of a sudden they dismiss because they're

22    afraid.  Okay.  I still want a jury trial.  And I'm going in

23    federal court in Toledo against these guys.  Okay.  So I've

24    already warned Mr. Fellheimer I'm coming, and there will be

15:26:24  25    a suit filed.  Okay.  And I just hope that they're not

|  | 1 | paying for this out of my money.  Mr. Fellheimer shouldn't |
|---|---|---|
|  | 2 | get a damned dime, okay, of my money, for this crook.  Okay. |
|  | 3 | That's all I really have to say. |
|  | 4 | THE COURT:  Thank you. |
| 15:26:39 | 5 | MR. POWERS:  Thank you. |
|  | 6 | THE COURT:  You want a couple minutes now |
|  | 7 | Mr. Fellheimer? |
|  | 8 | MR. FELLHEIMER:  I think so.  Can I approach |
|  | 9 | the bench for a moment, your Honor? |
| 15:26:54 | 10 | THE COURT:  Sure. |
|  | 11 | (Discussion at side bar off the record.) |
|  | 12 | THE COURT:  Let's see.  Recess, ten minutes. |
|  | 13 | What else -- do you think you're going to have any |
|  | 14 | testimony? |
| 15:27:28 | 15 | MR. FELLHEIMER:  That's what I want to find |
|  | 16 | out? |
|  | 17 | THE COURT:  All right.  All right.  You've got |
|  | 18 | ten minutes.  Okay? |
|  | 19 | (Thereupon, a recess was taken.) |
| 15:38:02 | 20 | THE COURT:  Okay.  Mr. Fellheimer, what's it |
|  | 21 | going to be, sir? |
|  | 22 | MR. FELLHEIMER:  No, I'm not going to call any |
|  | 23 | witnesses. |
|  | 24 | THE COURT:  Okay. |
| 15:38:11 | 25 | MR. FELLHEIMER:  Okay. |

1          THE COURT:  Very good.

2          Do you have argument you want to offer, Mr. Georgalis?

3               MR. GEORGALIS:  I do, Judge, briefly.

4               THE COURT:  Go ahead.

15:38:19  5               MR. GEORGALIS:  Judge, the Government believes

6     this Defendant should be detained.  There are no conditions

7     or set of conditions to reasonably assure his appearance for

8     any further court proceedings.  As the Court heard here

9     today, the Defendant is a flight risk here.  He's a

15:38:32 10    significant flight risk.  He has no ties to this community,

11    no ties to this district whatsoever and very few in any of

12    the United States of America.  He's not a citizen of the

13    this country.  He's a citizen of South Africa.  He's a green

14    card holder here, which means that if he's convicted of

15:38:47 15    these offenses, he can't be deported, which is a

16    significant, significant consequence to him, which to me

17    means he is a flight risk.

18          These are serious crimes, Judge, that carry serious

19    maximum terms of imprisonment.  The security frauds carry a

15:39:03 20    25-year sentence.  So the Defendant is facing very, very

21    serious crimes and very, very serious consequences.

22          The loss amount in this case is staggering, and as

23    this Court knows, oftentimes in white collar cases, the loss

24    amount is what drives a sentence.

15:39:17 25          Special Agent McGovern testified that the loss on this

1   case, just for a relatively short period of time, is

2   someplace between 30 and $50 million.  So it's a

3   significant, significant loss.

4       As this Court heard, the Defendant has very, very few

5   ties to this country at all.  He's selling off his vehicles,

6   to put them into cash which can be easily moved from country

7   to country.  He has significant ties in other countries,

8   ties into France, ties into South Africa with his siblings

9   living there, with a stated intention after this case,

10  overt, of going to France, of packing his bags and leaving.

11      There's money that is hidden and stowed away overseas

12  -- albeit, in his wife's name presumably, but he has access

13  to those funds, Judge.

14      Most importantly, he can run his scheme and has run

15  this scheme from anywhere in the world.  He doesn't have to

16  be in the United States.  He doesn't have to be in this

17  district to run his scheme.  He could leave this country, go

18  to wherever he's going to go and continue this world of

19  fraud that he's sort of created on himself.

20      The Defendant is a danger to the community, both

21  economically and physically.  This Court heard that there

22  are multiple recordings where the Defendant says that he

23  would do things to people if they did things he didn't like.

24  If they did things that were against his interests, he would

25  do things to them.  One could read into that however they

1    want, but these are threats, real threats, threats he makes

2    time and time again to people that would be witnesses in the

3    case against him.

4          So that's very, very significant.  But, even more --

15:41:04  5    maybe more significantly, he is an economic danger to

6    people.

7                    MR. FELLHEIMER:  Excuse me?

8                    MR. GEORGALIS:  An economic danger to people.

9    Mister -- Special Agent McGovern testified that all he needs

15:41:15 10    is a phone and Internet access in order to continue his

11    scheme to defraud.  He trades stock, not only in his own

12    name but in the name of other people and nominee names and

13    he could do so.  As part of the budget Mr. Fellheimer put

14    together for this Court, he's asking for this Defendant to

15:41:31 15    have access to the, international access to a phone.  That

16    is a significant risk.

17                    THE COURT:  Was there testimony that some of

18    the stock transferred through his wife's name?

19                    MR. GEORGALIS:  Yes, Judge, there was

15:41:39 20    testimony that --

21                    MR. FELLHEIMER:  Your Honor, they weren't

22    married then.

23                    THE COURT:  Okay.  I'm just --

24                    MR. FELLHEIMER:  They weren't married.

15:41:45 25                    THE COURT:  You're going to get your chance to

1    argue.

2                    MR. FELLHEIMER:  All right.

3                    THE COURT:  I'm just asking the question just

4    to make sure that I had that right.

15:41:52  5                    MR. GEORGALIS:  The Defendant -- the Defendant

6    only recently married Ms. De Maison, in 2013.

7                    THE COURT:  I read that in the --

8                    MR. GEORGALIS:  Seven or eight years, they

9    have two children together, Judge, ages six and seven.  So

15:42:04  10    they've been together since 2006 at least.  Perhaps earlier.

11    That's just the age of their kids.

12         So the threat to the community both economically and

13    physically is significant.  The threats of the witnesses in

14    this case are significant.  And last, Judge, the weight of

15:42:18  15    the evidence in this case is very, very strong.  Special

16    Agent McGovern testified to e-mails and text messages and

17    recordings, all of which inculpate the Defendant.  They are

18    his own statements regarding the scheme.  There's no way to

19    argue around what he's saying this those statements.  These

15:42:35  20    are his words.  They are coconspirator statements regarding

21    the Defendant's activities.  So the weight of the evidence

22    in this case is very strong.

23         Judge, perhaps, you know, most importantly, there's

24    nothing -- no argument I could make that would be as, I

15:42:51  25    think, significant or certainly as passioned as the

1      statements you heard today from Mr. Powers, a victim in this

2      case.

3           Mr. Powers, as he's testified to this Court, lost over

4      $500,000 with this Defendant.  And he said that he received

15:43:06  5      threats from this Defendant.  He said that this Defendant is

6      a flight risk and the Government believes that he's correct.

7      And there's nothing I can say that could be more, I think,

8      persuasive to this Court that this Defendant does not

9      deserve bond in this case and should be detained.

15:43:22 10                THE COURT:  Okay.

11           Before you -- I turn this over to you for your

12      argument, I want to talk to Ms. Cabanes.

13           You have an adopted the pretrial report from

14      California, correct?

15:43:34 15                PROBATION OFFICER:  Yes, your Honor.

16                THE COURT:  Is there anything here that you

17      heard today that would cause you to change your

18      recommendation from detention to some kind of bond?

19                PROBATION OFFICER:  No, your Honor.

15:43:43 20                THE COURT:  All right.  Thank you.

21                MR. FELLHEIMER:  Everything they presented

22      today, everything, when you start to look at it doesn't hold

23      up.  They say there are accounts overseas but none are his.

24      The money was transferred in 2011; not now, not in 2012, not

15:44:14 25      in 2013, not in 2014, back in 2011.

1          THE COURT:  Those accounts do belong to his

2     wife, correct?

3          MR. FELLHEIMER:  They weren't his wife then.

4          THE COURT:  I understand.  I got the date of

15:44:24  5     the marriage.

6          MR. FELLHEIMER:  She wasn't his wife.  He had

7     no legal interest by marital wife or community property.

8     None.  He has none.  No interest in it.  And he's not a

9     signor on the account.  I can understand if he was a signor

15:44:43 10     on the account, but he's not.

11          I looked at the threat.  Didn't seem like much of a

12     threat to me.  I listened to what it said.  I'm going to do

13     something unethical but not illegal.

14          THE COURT:  Do you think a threat is a

15:44:55 15     physical threat?

16          MR. FELLHEIMER:  No, I don't think --

17          THE COURT:  You think a threat could be --

18          MR. FELLHEIMER:  Mr. Powers stood here and

19     told you he threatened to sue me.  All I did was get a suit

15:45:05 20     dismissed.

21          THE COURT:  Let me ask my question.  Do you

22     think that a threat could include economic damage?

23          MR. FELLHEIMER:  A threat to sue is very

24     serious.  I don't like it, you don't like it, nobody likes

15:45:16 25     it.

1          THE COURT:  A threat to bring a suit with --

2     an invalid suit.

3          MR. FELLHEIMER:  Well, that's not what he

4     says.  He says you've done wrong.  If you can't explain

15:45:25  5     where this money went, you may face a suit.  Guess what?

6     I'm not sure that's invalid.  If in fact money disappeared

7     or didn't go where it should have gone, I don't like the way

8     the e-mails read.  That's not how I like to talk, but the

9     fact of the matter is suppose I mean -- you got to read this

15:45:43  10    thing for what it says.  It says you have to explain where

11    did all that money go.  And if you can't, I'm going to deal

12    with it or you're going to have a problem.  Well, yeah, just

13    like he has a problem because he has to explain a lot of his

14    actions since 2006.

15:45:59  15         THE COURT:  That wasn't the only threat.

16         MR. FELLHEIMER:  That was the only threat.

17    There is no threat in there.  No threat of bodily harm.

18         THE COURT:  No, there were threats against

19    other witnesses to the same -- to the same effect as I

15:46:10  20    understood the testimony.

21         MR. FELLHEIMER:  I haven't seen those.  I

22    haven't seen anything.

23         THE COURT:  You heard testimony, though.

24         MR. FELLHEIMER:  Yeah, but he -- hearsay on

15:46:17  25    hearsay on hearsay and I can't question.  And you don't know

1    the statement.  Bad enough we have an out-of-court statement

2    by a non-present witness on top of all that.

3                    THE COURT:  He's threatening to do the same

4    thing to that witness that Mr. Powers said that he did to

15:46:33 5    him, right?

6                    MR. FELLHEIMER:  Can I cross-examine

7    Mr. Powers?

8                    THE COURT:  You can argue about what

9    Mr. Powers said.

15:46:38 10                    MR. FELLHEIMER:  Mr. Powers?

11                    THE COURT:  As long as you do not attack

12    Mr. Powers personally, you may respond.

13                    MR. FELLHEIMER:  I'm not.  But, Mr. Powers, I

14    think some of his facts are incorrect.

15:46:46 15                    THE COURT:  Okay.

16                    MR. FELLHEIMER:  One, I understand he's angry.

17    I have e-mails, I have pleadings, I have motions.  There was

18    a case.  I came into the case very, very late, and I got it

19    dismissed.  I filed a Rule 15 dismissal and dismissed the

15:47:03 20    case.  I thought it was ridiculous and dismissed it.  That's

21    what I did.  I answered one of his motions, and I filed a

22    Rule 15 dismissal.  That's all I ever did in the case, came

23    in very, very late.

24                    THE COURT:  He had no reason to question

15:47:14 25    your --

1          MR. FELLHEIMER:  Just saying.

2          Now I've received nothing, but -- I get threatened by

3     Mr. Powers all the time.  He writes me threats.  I happen to

4     have them.  I could show them to you, to the Court.

15:47:24  5          I don't believe that Mr. Powers met Mr. De Maison at

6     the time he bought any stock from anybody.  He met

7     Mr. Powers some -- Mr. De Maison some time thereafter.

8          I also believe that Mr. Powers -- Mr. Powers expressed

9     his -- had bought a number of stocks from Mr. Kumn and other

15:47:45 10    people, only one of which was Casablanca Mining.

11          And when -- he got a hold of Zirk somehow.  And when

12     he got a hold of Mr. De Maison, Mr. De Maison, he was -- he

13     and Mr. De Maison, he suggested to Mr. De Maison he could

14     come to work for Casablanca Mining.  He could work with

15:48:04 15    Mr. De Maison.  We have e-mails to that effect.  And Mr. De

16     Maison, for reasons best known to himself, gifted, gave,

17     gifted, shares in Lustros to Mr. Powers.  Not -- didn't cost

18     him a dime.

19          How many shares did you get?  200,000 shares or

15:48:27 20    something?

21               MR. GEORGALIS:  Objection, Judge.  This isn't

22     evidence.  I don't know what this is.

23               MR. FELLHEIMER:  Well, gifted shares to him.

24     He didn't pay for them.  They were gifted.

15:48:36 25          Look.  Mr. Powers is very angry.  I understand that.

1    And he's been sick, and I do understand.  I don't want to

2    attack Mr. Powers, but it's also not evidentiary.  And, you

3    know it's not evidence.

4                    THE COURT:  The statute gives him a right.

15:48:54  5                MR. FELLHEIMER:  I understand and I sat and

6    listened.

7                    THE COURT:  You did.

8                    MR. FELLHEIMER:  Just like I read his e-mails,

9    I sat and listened.  All right.

15:49:04 10    So I parsed down what the Government is saying.  The

11   first thing they say, I have to deal with, most importantly

12   is this whole concept what's he going to do with the

13   computer.  I am sure that we can work out a limitation on

14   web sites and any time he accesses the web because I'm not

15:49:26 15   going to web him.  I'm going to e-mail him.  I can -- the

16   Government can see it.  I'll set it up so the Government can

17   just monitor what he puts on the web.  That's doable, and I

18   can do it.

19    So he's not looking to get on the web.  In fact, I'll

15:49:39 20   restrict him so he can't get on.  All he can get is e-mails,

21   and the e-mails -- you can restrict who he gets e-mails

22   from, I don't care, but it's really e-mails to and from me.

23   We'll send him documents that way and send either that way

24   or through dock landing or we can restrict that.  If he

15:50:00 25   doesn't have a passport, he can't go anywhere.  If he's

1    wearing a bracelet, you know, a monitor, he can't go

2    anywhere.  Yeah, he doesn't have any ties to Ohio.  You

3    decide to sue him in Ohio.  He was in California.  That's

4    where he was arrested.  That's where he lived.  Okay.

15:50:18  5    We're trying our best.  So we said okay, you want --

6    you sued him here.  Okay.  We'll put him in an apartment

7    less than a mile from this building, less than a mile from

8    this building.  We'll restrict his movement.  We'll -- he'll

9    be in the apartment but at least that way, we can deal with

15:50:35 10    it and we can do -- and we said to the Government we'll sit

11    down and show you documents.  We'll go over it all with you,

12    which I can't do if he's in Youngstown because I can't get a

13    computer.  I can't take the documents to him.  I can't do

14    anything.  I'm really --

15:50:48 15    THE COURT:  What's the status of this part?

16    MR. FELLHEIMER:  My wife has arranged for --

17    it's in the budget.  The number the broker is waiting to

18    hear from me.  I don't know what I'm going to do but as soon

19    as -- if your Honor says okay, upon proof that the

15:51:04 20    apartment's there and everything, it'll be arranged

21    immediately.  It's all worked out and talked about.  My

22    wife's a lawyer, by the way.  The name of the firm

23    Fellheimer.  She's a member of the bar, not this Court but

24    Pennsylvania, New Jersey, and New York, and --

15:51:16 25    THE COURT:  You know, the Court is somewhat

1    sympathetic with the question of your preparation for

2    defense and the complexity of the case and the volumes

3    involved.  So I'm going to let Mr. Georgalis address that

4    also when you get done but --

15:51:32  5    MR. FELLHEIMER:  I'm trying to find a way to

6    be able to do this that he's not a flight risk.  I am

7    willing to agree because you can't order this, the

8    Government can't demand it, but I'll offer it.  For him, not

9    for me.  He will not speak to any witness.

15:51:46 10    THE COURT:  Well, he's not going to speak to

11    any witnesses.

12    MR. FELLHEIMER:  He will not speak to any

13    witnesses.  If you allow him to go, he will not call the

14    witness.  He will not e-mail the witness.  He won't talk to

15:51:55 15    a witness.  And if the witness writes to him, he will not

16    write back.  He will not talk to any witnesses.  I may talk

17    to witnesses, as is my right as his counsel, but he will not

18    talk to any witnesses.  All I want him to be able to do is

19    help me prepare not only for this trial, but we have the

15:52:15 20    whole thing going on in New York, and the two --

21    THE COURT:  I'm not familiar with what's in

22    New York.

23    MR. FELLHEIMER:  There's a suit in New York

24    called SEC versus Cope, et al., which he is a Defendant,

15:52:26 25    along with the other names you heard around here.  The U.S.

1    Attorney, Mr. Georgalis, and his team, and SEC senior

2    counsel, Fisher, Howard Fisher, work together, interview

3    witnesses together.  They're working together on this.

4        Now, we have filed motions with Judge Cote in the

15:52:48  5    District Court of New York, Southern District, asking her to

6    stay that case pending this case, and also to -- there's an

7    asset freeze, and to modify, we entered into an agreement

8    yesterday with the section to schedule that SEC hearing on

9    the asset portion on the 22nd, but the big stay hearing

15:53:13 10    won't be until early December, I think the 4th.

11        The Government -- the SEC is considering maybe

12    agreeing to some stay or modification, some form of stay.

13    We're working with them on that.

14        But, there's that whole case is going on, and these

15:53:31 15    two have gone simultaneously.  And again, tons and tons of

16    documents.  Your Honor, I don't believe $30 million ever got

17    transferred here.  I think the numbers are going to come way

18    down.  You can just take one whole zero off of that, at

19    least.  Easily, it's going to come way down and I think --

15:53:53 20              THE COURT:  $300,000?

21              MR. FELLHEIMER:  No, $3 million.

22              THE COURT:  $3 million, 30 million.  He said

23    30 to $50 million I think he said, right?

24              MR. GEORGALIS:  Yes.

15:54:02 25              MR. FELLHEIMER:  Yes.  I think off.

1              THE COURT:  $3 million?

2              MR. FELLHEIMER:  What?

3              THE COURT:  $3 million?

4              MR. FELLHEIMER:  Yeah, 3 to 5 is the amount of

15:54:08  5    money but not to him, and we'll get into all that.  I

6    mean --

7              THE COURT:  We're not trying the case right

8    now.

9              MR. FELLHEIMER:  Right.  We're not trying the

15:54:15 10   case.  I'm not prepared to try the case and never going to

11   be prepared to try the case if he's sitting in Youngstown.

12   I'll never be able to sit with him and get documents in

13   front of him and say what's this, what's that, what's this,

14   what that's.  And I think maybe frankly, I think if you --

15:54:31 15   if the Government will meet us halfway with this, we'll be

16   able to help the Government understand this case better.

17        I'm not -- this is -- you know, your Honor knows 90 X

18   percent of the cases that come before this Court -- this

19   Court, meaning all the District Courts on criminal matters

15:54:48 20   get settled.  The opinion, you know, plea bargaining,

21   discuss that, how important it is.  So I'm not looking to

22   necessarily have a trial in this case.  We're trying to work

23   with the Government.  But, I think we can restrict his

24   ability to get on the Internet if we could just get e-mails

15:55:06 25   and if we could just get e-mails from the -- I won't even

1    use dock -- break them all up so he can get all e-mails and

2    get them, you know -- I'll allow the Government access to

3    his web browser; not to my e-mail but to his web browser.

4    So he'll know he's not on the web.  Keep him off the web.

5    But, let him -- it would be eight-tenths of a mile.

6    They can go visit him.  Just down the street.  But, if he's

7    in Youngstown jail, I can't even take my computer.  I can't

8    take that in.  I can't even take it in and say hey look at

9    this, look at that, look at this.  All he can do is write me

10   these barely legible notes that he sends me because he can't

11   have a computer to write them legibly.

12   I can't prepare for trial.  I can't prepare for

13   anything.  I can't give the Government what it really wants

14   from us, the kind of cooperation it wants without having him

15   access to it, to the e-mail, and access to be able to type

16   up and write it, and that's all I'm looking for, being able

17   to prepare.

18   He's not running away.  Believe me.  He's had plenty

19   of opportunity.  He could have gone easily from, you know,

20   when I was out there, and I met with the FBI, these

21   gentlemen, and I told them I represented Zirk and some other

22   people, and there was some objection to that, you know.  He

23   knew they were on his tail.  They knew obviously, he was the

24   target.  He could have gone.  He didn't.  No, he doesn't

25   have much of way of ties here.  It's not his home.

1          THE COURT:  Okay.

2          MR. FELLHEIMER:  We can set him up and we can

3    protect him.

4          THE COURT:  Let me hear from Mr. Georgalis.

15:56:46  5    You know, I am sympathetic about the complexity of the

6    case, Mr. Georgalis, as I think you can appreciate.  So tell

7    me what you're thinking here.

8          MR. GEORGALIS:  Judge, a lot of thoughts; one

9    of which is obviously, Mr. Engelbrecht would not be the

15:57:02 10    first white collar criminal defendant to be detained

11    pretrial.  It happens.

12          It's not the Government's fault that he put himself in

13    a position to be a flight risk, but he put himself in a

14    position to be a danger to the community, and he put himself

15:57:18 15    in those positions knowing the complexity of his case,

16    knowing how difficult it would be to defend himself.

17          The risk of his flight is too significant.  The risk

18    of the danger to the community is just too significant to

19    ignore.

15:57:32 20          With respect to preparing the case, I would recommend

21    to the U.S. Attorney that if the Defendant needed more time,

22    if he wanted to waive additional speedy trial rights to

23    extend time by which we have to indict or otherwise proceed

24    with the case, I'd recommend to the U.S. Attorney that we

15:57:47 25    give him more time.

1        If the Defendant were to move a District Court at some

2    point that this is a complex case, we would consent that

3    this is a complex case and allow more time for the Defendant

4    to work with his attorney to prepare his defense.

15:58:01  5        These are the kind of things that we can do to sort of

6    make sure that he's prepared and his attorney's prepared.

7    But, again Judge, the risks are just too high.

8                THE COURT:  Okay.  If there are terms and

9    conditions that would satisfy the threat to the community or

15:58:24 10   his appearance, I haven't heard them.

11        So I'm going to give you until Monday, to get -- to

12   put --

13                MR. FELLHEIMER:  You mind if I come closer?

14                THE COURT:  Sure.  I said I'm going to give

15:58:37 15   you until Monday to make some kind of proposal to Pretrial

16   Services.

17                MR. FELLHEIMER:  Yes, sir.

18                THE COURT:  That would satisfy them as to the

19   danger to the community issues and the danger of flight

15:58:49 20   issue.

21                MR. FELLHEIMER:  Yes, sir.

22                THE COURT:  Now, I've heard you talk about

23   some things.  I'm not -- as I sit here, I'm not aware of

24   what that would be that would satisfy the Court, but if --

15:59:01 25   if you want to put together something that's going to cover

1    all of these issues --

2                    MR. FELLHEIMER:  Yes, sir.

3                    THE COURT:  -- to the satisfaction of Ms.

4    Cabanes, and I'll give you until Monday to do that.

15:59:11 5                    MR. FELLHEIMER:  Yes, sir.

6                    THE COURT:  And then we'll see.  But, you

7    know, my initial inclination is I don't know how -- I don't

8    know what that would look like.

9                    MR. FELLHEIMER:  I will.

15:59:22 10                    THE COURT:  You hear me?

11                    MR. FELLHEIMER:  Yes, sir.

12                    THE COURT:  Ms. Cabanes.

13                    PROBATION OFFICER:  Yes?

14                    THE COURT:  Is that going to be something you

15:59:27 15    might be willing to entertain?

16                    PROBATION OFFICER:  Yes, your Honor.

17                    THE COURT:  Okay.

18        So in the meantime, you're going to be remanded to the

19    custody of the Marshal Service.

15:59:36 20                    MR. FELLHEIMER:  May I have a day Monday, sir?

21                    THE COURT:  We'll have a time here Monday.

22    What's --

23                    DEPUTY CLERK:  Monday's the holiday.

24                    MR. FELLHEIMER:  I have a hearing tomorrow.

15:59:44 25    So I was hoping to work on it tomorrow and Monday get it

1    out.

2                    THE COURT:  I'm telling you any time Monday is

3    fine.  You can get Mrs. Cabanes' contact information and

4    make sure you copy Mr. Georgalis so he has an opportunity to

16:00:00  5    make some input.

6                    MR. FELLHEIMER:  We'll have something to

7    Pretrial Services Monday, your Honor.

8                    THE COURT:  Monday's a holiday.  Tuesday.

9                    MR. FELLHEIMER:  Sorry?

16:00:07 10                    THE COURT:  Monday's a holiday for us federal

11   employees.

12                    MR. FELLHEIMER:  What is Monday?

13                    THE COURT:  Columbus Day.

14                    MR. FELLHEIMER:  Oh, Federal Court is closed.

16:00:18 15                    THE COURT:  Mr. Georgalis has the day off,

16   too, maybe.  So we're going to make this Tuesday.  All

17   right?

18                    MR. FELLHEIMER:  Yes, sir.  And I will copy

19   Mr. Georgalis.  Anybody else?

16:00:31 20                    THE COURT:  Ms. Cabanes is the important

21   person here.  And then she will communicate with me, and I

22   will make it -- I will make a written ruling on this.

23                    MR. FELLHEIMER:  Thank you, your Honor.

24                    THE COURT:  All right.  Anything further?

16:00:45 25                    MR. FELLHEIMER:  No, your Honor.

1          THE COURT:  Mr. Georgalis?

2          MR. FELLHEIMER:  Except to thank you for your

3  patience.

4          MR. GEORGALIS:  Can I say one thing?  I'm sure

16:00:50  5  the Court knows, Ms. Cabanes knows, location monitoring

6  doesn't work I think the way Mr. Fellheimer thinks it works,

7  and as long as that's part of the --

8          THE COURT:  I think you're right.  Ms.

9  Cabanes?

16:01:00  10          MR. GEORGALIS:  She knows that.  So I think

11  that's an important consideration.

12          THE COURT:  All right.  Okay.

13          MR. FELLHEIMER:  Could you repeat what you're

14  saying?

16:01:07  15          MR. GEORGALIS:  Yeah.  It's not -- monitoring,

16  the Pretrial folks know every single second during the day

17  where exactly he is.  There's occasional pings that give

18  them an idea where he is.  So he could cut the bracelet,

19  run, and if they don't check those pings until a day or two

16:01:24  20  later, he's gone.

21          THE COURT:  Okay.

22          MR. FELLHEIMER:  But, you'll have his

23  passport.  I'll deal with that.  I have until Monday.

24          THE COURT:  Ms. Cabanes is an expert on all

16:01:34  25  this.  So I appreciate everyone's time.

1        Mr. Powers, I appreciate you coming and addressing the

2   Court, sir.

3        And we will adjourn this hearing, and we will make a

4   ruling next week after we receive an updated report from

16:01:50  5   Pretrial Services.  All right?

6                 MR. FELLHEIMER:  Thanks, Judge.

7                 THE COURT:  Please adjourn the Court.

8        I'm going to allow these exhibits by the way.  The

9   recording, is that of any value, Mr. Georgalis?

16:02:01  10                 MR. GEORGALIS:  We could give it to you,

11   Judge.

12                 THE COURT:  Well, there are things on there

13   that weren't played here that he hasn't heard?  I don't

14   think the recording is really going to be helpful, frankly.

16:02:10  15                 MR. GEORGALIS:  Okay.  Everything's fine.

16                 MR. FELLHEIMER:  May I have copies?

17                 MR. GEORGALIS:  Yeah, you can have them.

18        (Proceedings adjourned at 4:02 p.m.)

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2              I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    s/Shirle Perkins
     Shirle M. Perkins, RDR, CRR
9    U.S. District Court - Room 7-189
     801 West Superior Avenue
10   Cleveland, Ohio 44113
     (216) 357-7106
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25