FILED

2015 MAR 24  PM 3: 39

U.S. DISTRICT COURT
N. DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **I N F O R M A T I O N** |
| Plaintiff, | ) |
| | ) **1:15CR117** |
| v. | ) CASE NO. _____ |
| | ) Title 15, United States Code, |
| IZAK ZIRK DE MAISON (aka IZAK ZIRK ENGELBRECHT, aka ZIRK ENGELBRECHT, | ) Sections 78j(b), 78ff; 17 Code of |
| | ) Federal Regulations § 240.10b-5; |
| | ) Title 18, United States Code, |
| Defendant. | ) Sections 1343, 1348, 1349 and |
| | ) 1957 |

JUDGE ADAMS

The United States Attorney charges:

I.    GENERAL ALLEGATIONS

At all times relevant to this Information, except where otherwise noted:

A.    Defendant, Relevant Entities, and Bank Accounts

1.    Defendant IZAK ZIRK DE MAISON (aka IZAK ZIRK ENGELBRECHT, aka ZIRK ENGELBRECHT, hereinafter, "Defendant") was a resident of Redlands, California, and Seattle, Washington.

2.    Bridges Investments, Inc. ("Bridges") was a Nevada corporation with its principal place of business at 9 Via Del Garda, Henderson, Nevada 89011. Bridges was formed in or around April 2005. Angelique D., Defendant's wife, was the president, director, and secretary of

record, but Defendant maintained de facto control of all aspects of the business and all stock trades and transactions.

3.  Suprafin, Ltd. ("Suprafin") was a Wyoming corporation with its principal place of business at 1621 Central Avenue, Suite 3380, Cheyenne, Wyoming 82001. Suprafin was formed in approximately 2009. Defendant was the president and vice president of Suprafin.

4.  Sunatco, Ltd. ("Sunatco") was a Wyoming corporation with its principal place of business at 1621 Central Avenue, Cheyenne, Wyoming 82001. Sunatco was formed in approximately 2013. Defendant was the chairman and chief executive officer of Sunatco.

5.  Wealthmakers, Ltd. ("Wealthmakers") was a Wyoming corporation with its principal place of business at 1005 S. Center Street, Redlands, California 92373. Wealthmakers was formed in approximately 2007. Thomas R. was the president, and Defendant was the vice president of Wealthmakers.

6.  Walker River Investments Corp. ("Walker River") was a Wyoming corporation with its principal place of business at 2510 Warren Avenue, Cheyenne, Wyoming 82001. Walker River was formed in approximately 2011. Margaret J. was the president of Walker River, but Defendant maintained de facto control of all aspects of the business.

7.  Marquis Financial Services of Indiana, Inc. ("Marquis") was a corporation organized under the laws of the State of Wisconsin with its principal place of business in Encino, California. Marquis was a member of, and regulated by, FINRA (as Central Registration Depository Number 20733), as well as other stock, option, and commodity exchanges and self-regulatory organizations.

8.  Merrimen Investments, Inc., ("Merrimen") was a Wyoming corporation with its principal place of business at 10409 Strathmore Drive, Santee, California 92071. Merrimen was

formed in approximately 2010.  Defendant was the principal of Merrimen until in or around 2012.

9.      Worldbridge Partners, Inc. ("Worldbridge") was a Nevada corporation with its principal place of business at 29191 Weybridge Drive, Westlake, Ohio 44145.  Worldbridge was formed in approximately 2009.  Jason C. was the president, and Louis M. was the vice president of Worldbridge.

10.      Structured Management, Inc. ("SMI") was a Nevada corporation with its principal place of business at 29191 Weybridge Drive, Westlake, Ohio 44145.  SMI was formed in approximately 2003.  Jason C. was the president and director of SMI.

11.      Small Cap Resource Corp. ("Small Cap Resource") was a New York corporation with its principal place of business at 14 Vanderventer Avenue, Suite 138, Port Washington, New York 11050.  Small Cap Resource was formed in approximately 2011.  Kieran K. was the president of Small Cap Resource.

12.      SB3, LLC ("SB3") was a Wyoming corporation with its principal place of business at 10409 Strathmore Drive, Santee, California 92071.  SB3 was formed in approximately 2007.

13.      Esposito Consulting Corp ("Esposito Consulting") was a New York corporation with its principal place of business at 100 Eton Road, Thornwood, New York 10594.  Esposito Consulting was formed in approximately 2012.  Justin E. was the principal of Esposito Consulting.

14.      Neoterra Enterprises, LLC ("Neoterra") was a New York corporation with its principal place of business at 3 Glen Lane, Woodstock, New Jersey 12498.  Neoterra was formed in approximately 2010.  Kona B. was the principal of Neoterra.

15.     Traverse International ("Traverse") was a Nevada corporation with its principal place of business at 2360 Corporate Circle, Suite 400, Henderson, Nevada 89074.  Traverse was formed in approximately 2012.  Louis M. was the president of Traverse.

16.     Kensington & Royce, Ltd ("Royce") was a Nevada corporation with its principal place of business at 646 W. Highland Avenue, Redlands, California 92373.  Royce was formed in approximately 2006.  Angelique D. was the president of Royce, but Defendant maintained de facto control of all aspects of the business.

17.     Global Marketing Consultants, Inc. ("Global Marketing") was a Wyoming corporation with its principal place of business at 2710 Thomes Avenue, Cheyenne, Wyoming 82001.  Global Marketing was formed in approximately 2009.  Paul C. was the principal of Global Marketing.

18.     Wall Street At Home.com, Inc. ("WAH.com") was a New York corporation with its principal place of business at 16501 Ventura Boulevard, Suite 512, Encino, California 91436.  WAH.com was formed in approximately 1999.  Gregory G. was the chief executive officer of WAH.com.

19.     Since at least on or about January 1, 2007, bank account number x1581 at City National Bank was opened in the name of Royce.

20.     On or about January 16, 2008, bank account number x7565 at City National Bank was opened in the name of SB3.

21.     On or about February 26, 2008, Angelique D. opened, and caused to be opened, bank account number x9797 at Washington Mutual Bank, NA, later acquired by JPMC, in the name of Bridges.  Angelique D. and Trisha M. were listed on the signature card for this account.

22.     On or about July 23, 2008, bank account number x8413 at City National Bank was opened in the name of Wealthmakers. A superseding signature card for this account listed Trisha M. as secretary and Charlotte H. as the non-signatory president of the company.

23.     On or about December 7, 2009, Defendant opened, and caused to be opened, bank account number x9320 at Wachovia Bank, later acquired by Wells Fargo Bank ("Wells Fargo"), in the name of Suprafin.

24.     On or about August 9, 2011, Kieran K. opened, and caused to be opened, bank account number x3820 at JP Morgan Chase ("JPMC") in the name of Small Cap Resource. A signature card for this account listed Kieran K. as the president of Small Cap Resource and the sole signatory for the account.

25.     On or about January 20, 2012, Louis M. opened, and caused to be opened, bank account number x5234 at Fifth Third Bank in the name of Traverse.

26.     On or about June 15, 2012, Defendant opened, and caused to be opened, bank account number x8389 at Citibank in the name of Lustros. The signature card listed Trisha M. as the signatory on the account.

27.     On or about June 28, 2012, Defendant opened, and caused to be opened, bank account number x8503 at U.S. Bank in the name of Suprafin.

B.     The Relevant Publicly Traded Companies

28.     Lenco Mobile, Inc. ("Lenco") was incorporated in the State of Delaware in 1999 under the name Schochet Holdings Corporation. On or about February 20, 2009, after also using the company names CIC Holding Company, Inc., Global Wear, Ltd., and Sovereign Wealth Corporation ("Sovereign Wealth"), the company changed its name to Lenco. It had offices in Santa Barbara, California. When the company was named Sovereign Wealth, the common stock

traded under the symbol "SOVW," and its purported business purpose was the same as when it used the name Lenco; that is, the management of technology solutions for brand owners and mobile telephone network operators. Lenco's stock traded under the symbol "LNCM."

29.     Kensington Leasing, Ltd. ("Kensington") was incorporated in the State of Nevada on or about June 27, 2008, with offices in Redlands, California. Kensington purported to specialize in leasing equipment to legal, medical, and real estate professionals. Kensington's common stock traded under the symbol "KNSL."

30.     Casablanca Mining, Ltd. ("Casablanca") was incorporated in the State of Nevada on or about June 27, 2008, under the original name of USD Energy Corporation ("USD"). On or about February 17, 2011, the company changed its name to Casablanca. Casablanca had offices in Santee, California. When Casablanca was named USD, the common stock traded under the symbol "UEGY," and its purported business purpose was exploration stage oil and gas production. After changing to Casablanca, the purported business purpose switched to the acquisition, exploration, development, and operation of precious metal properties in Chile. Casablanca's stock traded under the symbol "CUAU."

31.     Lustros, Inc. ("Lustros") was incorporated in the State of Utah on or about July 30, 1980, under the name MAG Enterprises, Inc. On or about April 12, 2012, after also using the company names Safari Associates, Inc. and Power-Save Energy Company, the business changed its name to Lustros. Lustros had offices in Redlands, California. Under the name Lustros, the purported business purpose was the production of food grade copper sulfate. Lustros' stock traded under the symbol "LSTS."

32.     Gepco, Ltd. ("Gepco," and together with Lenco, Kensington, Casablanca, and Lustros, the "Manipulated Public Companies") was the latest corporate iteration of the company

6

that started out as Kensington. After abandoning the equipment leasing business under Kensington, the company changed its name to Wikifamilies, Inc. with the purported business purpose of designing, developing, and operating a social media website. After a failed merger with ClairNET, Ltd., the company was abandoned until reclaimed through court proceedings that appointed Trisha M. as the custodian of the company. On or about September 11, 2013, the company changed its name to Gepco. The purported business purpose of Gepco was to sell and broker high-end investment grade diamonds obtained from wholesale diamond cutters. Gepco's common stock traded under the symbol "GEPC."

33. Stock for all of the Manipulated Public Companies was quoted on OTC Markets, Inc. ("OTC Markets"), an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers. Companies trading on OTC Markets tended to be extremely small, and the stock in those companies tended to be closely held (that was, owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

C.    Defendant's Role in the Manipulated Public Companies

34. For each of the Manipulated Public Companies, Defendant controlled a substantial number of outstanding shares through his personal companies, co-conspirators, and associates over which he had influence and control. At times, Defendant was also listed as an officer or director of the Manipulated Public Companies. Defendant used co-conspirators to identify and solicit investors to purchase his shares of the Manipulated Public Companies in the open market and through private placement transactions. Once potential investors were identified for private placements, for instance, Defendant combined with the co-conspirators to induce the potential investors to purchase shares and close the purported deal.

7

D.    Defendant's Co-Conspirators

    (i)    Consultants

35.    Defendant used consultants to access wealthy potential investors that the consultants had developed as contacts and clients over time. Defendant paid undisclosed commissions of cash and stock to the consultants when they persuaded their clients to purchase Defendant's shares in the Manipulated Public Companies.

36.    Jason C., a resident of Gates Mills, Ohio, was a former broker who later purportedly consulted almost exclusively for Defendant's publicly traded microcap companies (defined below). Effective on or about May 27, 2003, FINRA barred Jason C. from association with any FINRA member in any capacity. Jason C. solicited potential investors to purchase stock in the Manipulated Public Companies without disclosing that he received commissions from Defendant, that it was Defendant's and Jason C.'s shares his clients were purchasing, and that his clients' investments were used to enrich the co-conspirators. Defendant, Jason C., and others, agreed to use private placements, stock promoters, and non- arms-length trading with related parties to create the illusion of volume, to inflate the stock price, and to divest their own shares.

37.    Louis M., a resident of Bay Village, Ohio, was a registered broker with FINRA. Louis M. worked for companies controlled by Jason C. Louis M. provided false documentation to Jason C. to assist with the deposit and sale of securities for the benefit of Jason C. and the other co-conspirators. Louis M. also created his own entities to assist Jason C. in the deposit and sale of shares in the Manipulated Public Companies and to transfer money to overseas brokerage accounts.

(ii)    Registered Brokers

38.    Defendant used registered brokers to liquidate free trading shares of stock in the Manipulated Public Companies. Defendant paid the registered brokers' commissions for purchasing Defendant's shares of the Manipulated Public Companies without the brokers disclosing the commissions to their clients.

39.    Gregory G., a resident of Stevenson Ranch, California, was registered as a broker with FINRA. In or around July 2001, to in or around February 2013, Gregory G. was employed as a broker by Marquis, a broker-dealer registered with the SEC and FINRA, at its office in Tarzana, California. Gregory G. was the controlling member of Marquis.

40.    Stephen Wilshinsky, a resident of Woodland Hills, California, was registered as a broker with FINRA. Wilshinsky worked as a registered broker with Oppenheimer & Co. ("Oppenheimer") from in or around November 2004, through in or around March 2009, and with Marquis at its office in Tarzana, California, from in or around April 2009, through in or around June 2011.

41.    Jack T., a resident of Glen Cove, New York, was registered as a broker with FINRA. In or around July 2010, to in or around September 2011, Jack T. was employed as a broker by Marquis at its office in Tarzana, California.

42.    Talman H., a resident of New York, New York, was registered as a broker with FINRA. Talman H. worked for seven different New York-based securities firms between in or around 2007, and in or around 2014.

43.    William S., a resident of New York, New York, was registered as a broker with FINRA. William S. worked for seven different New York-based securities firms between in or around 2007, and in or around 2014.

(iii)    "Boiler Room" Promoters

44.    Defendant also used promoters in so-called "boiler rooms" to cold call and solicit potential investors to purchase shares of the Manipulated Public Companies. Defendant dictated what stocks the promoters pushed. The cold calls to potential investors typically coincided with favorable press releases or other information that Defendant caused to be released. The boiler room promoters touted the Manipulated Public Companies using high pressure sales tactics and misrepresentations about the value of the Manipulated Public Companies and their stock. The boiler room promoters did not disclose that Defendant paid them commissions on the sale of Defendant's stock to the investors, either on the open market or through private placements.

45.    Kieran K., a resident of Port Washington, New York, was registered as a broker with FINRA. Kieran K. started his own business, Small Cap Resource, which functioned as a boiler room and was in the business of stock promotions.

46.    Kona B., a resident of Asheville, North Carolina, and former resident of Glen Cove, New York, was an employee of Small Cap Resource. Kona B. cold called potential investors and was paid commissions from Defendant on the sales of stock he made in the Manipulated Public Companies. Kona B. directed that his commissions be made to Neoterra, an entity he controlled.

47.    Justin E., a resident of Thornwood, New York, was an employee of Small Cap Resource. Justin E. cold called potential investors and was paid commissions from Defendant on the sales of stock he made in the Manipulated Public Companies. Justin E. directed that such payments be made to Esposito Consulting, an entity he controlled.

48.     Victor A., a resident of Port Washington, New York, was an employee of Small Cap Resource. Victor A. cold called potential investors and was paid commissions from Defendant on the sales of stock he made in the Manipulated Public Companies.

(iv)    Attorneys

49.     Defendant's attorneys provided legal opinions under Title 17, Code of Federal Regulations, Section 230.144, among others, often referred to as Rule 144, for Defendant and his co-conspirators. The Rule 144 legal opinions contained misrepresentations about the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other misrepresentations. Defendant provided the Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements about depositing the stock and lifting restrictions.

E.     The SEC and Securities Regulations

50.     The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the United States-based stock exchanges. Stock for the Manipulated Public Companies was registered with the SEC.

51.     Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the SEC in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in companies subject to SEC regulation; and (c) the public. Federal securities laws and regulations also

prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

52.    Title 15, United States Code, Section 78j(b), made it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors, including: (a) employing devices, scheme, and artifices to defraud; (b) making untrue statements of fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated as a fraud upon investors, in connection with the purchase and sale of the securities.

53.    Failure to disclose to investors, commission payments from third parties, including payments from issuers, was considered an omission of a material fact as part of a securities transaction.

F.    Relevant Regulatory Principles and Definitions

54.    "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which had a low market capitalization. Microcap stocks were subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that were traded on notable exchanges such as the National Association of Securities Dealers Automated Quotations ("NASDAQ") and the New York Stock Exchange ("NYSE"). NASDAQ and NYSE had specific standards that were monitored and enforced for a company to have its stock traded on those exchanges. Additionally, large blocks of microcap stock were often

controlled by small groups of individuals, which enabled those in the group to control and orchestrate manipulative trading in those stocks.

55. "Wash trades" were purchases and sales of securities that matched each other in price, volume, and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of a company through Broker A while simultaneously selling 100 shares at $5.00 per share of the company through Broker B.

56. "Matched trades" were similar to wash trades, but involved a related third person or party who placed one side of the trade. For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of a company through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of the company through a broker.

57. "Marking the close trades" involved attempting to influence the closing price of a security by executing purchase or sale orders at or near the close of normal trading hours. Such activity could artificially inflate or depress the closing price for the security.

58. Wash trades, matched trades, and marking the close trades were used to create the appearance that the stock price and volume raised as a result of genuine market demand for the securities.

## II.    FACTUAL ALLEGATIONS

59. From on or about September 28, 2006, through on or about September 18, 2014, Defendant, together with others known and unknown to the United States Attorney, agreed to defraud investors and potential investors in the Manipulated Public Companies by issuing millions of shares to themselves at little or no cost and then artificially controlling the price and

volume of traded shares through, among other means: (a) paying undisclosed commissions to brokers and former brokers for directing client funds to make both authorized and unauthorized investments; (b) fraudulently concealing the co-conspirators' ownership interests in the Manipulated Public Companies; and (c) engineering price movements and trading volume in the stocks.

### G.      The Lenco Manipulation Scheme

    (i)      Control of the Stock

60.      Lenco originated as a public company in 1999 under the name of Shochet Holdings Corporation ("Shochet"), which purportedly provided financial services. After Shochet changed its name to Sutter Holdings Company, Inc. ("Sutter"), the primary business focus was on mortgage origination. By on or about December 31, 2005, Sutter ceased all of its business operations and became a shell company. In or around November 2006, the company changed its name to CIC Holding Company, Inc., in which Defendant was the president and Angelique D. a director. Defendant and Angelique D. personally held over 3,000,000 shares each of CIC Holdings before the transformation of the company into Lenco.

61.      Defendant obtained control of shares in Lenco and its predecessor using a variety of associates and other companies. For example, on or about October 31, 2007, Defendant caused Lenco to issue 210 shares of Preferred Series B stock to Angelique D. Then, on or about April 8, 2008, Angelique D. converted 42 shares of Preferred Series B stock to 2,100,000 common shares. On or about April 18, 2008, Defendant caused Lenco to issue a total of 772,000 shares of common stock to Bridges and Angelique D. On or about May 9, 2008, Defendant caused Lenco to issue Trisha M. and Stephen B., two of Defendant's associates, 800,000 shares of common stock.

14

(ii)    The Fraudulent Stock Manipulations

62.    After gaining control of Lenco's unrestricted common stock, Defendant, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Lenco's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Lenco stock at a profit when the share price reached desirable levels.

63.    It was a part of the scheme to raise the stock price through manipulative stock trading techniques to a level beneficial to the co-conspirators. Brokers purchased public shares using accounts belonging to clients, some of whom were unaware that they held the stock. This fraudulent arrangement reduced the possibility that the stock would be subsequently resold in the market, which gave the co-conspirators control over the trading activity and kept the price artificially inflated for an extended period on OTC Markets quotes. Wilshinsky, Gregory G., Jack T., Talman H., and William S. all used their position as registered brokers to purchase Defendant's shares in Lenco through their client accounts.

64.    The first Lenco pump started on or about March 7, 2008, with the co-conspirators using a combination of matched trades, wash trades, and marking the close trades to inflate the stock price. During this first period, the co-conspirators manipulated Lenco's stock price by raising it from a low of approximately $0.10 per share (with trading volume of approximately 5,000 shares per day) in or around March 2008 to a high of approximately $4.95 per share (with trading volume of approximately 327,840 shares per day) just a month later on or about April 25, 2008.

65.    Because many of the outstanding shares were restricted, the price could not immediately drop when the co-conspirators stopped pumping up the stock. Approximately one year later, on or about March 6, 2009, however, when restrictions began to lift, the share price

15

was quoted at approximately $3.00 per share.  After another pump cycle, in or around November 2011, the stock eventually dropped to approximately $0.24 per share.

66.    The value of Lenco's stock had little or no relation to its then current and future earnings potential or business operations.  At its highest closing price of approximately $6.50 per share on or about July 25, 2008, Lenco's market capitalization was approximately $418,007,037 based on approximately 64,308,775 shares outstanding.  However, on or about November 9, 2009, Lenco filed a form with the SEC, signed by Lenco's president, reporting that as of December 31, 2008, Lenco had only $2,854,041 in total assets (including intangibles such as "goodwill"), $805,085 in total liabilities, and $781,420 claimed in net income for the year ended December 31, 2008.

H.    The Kensington Manipulation Scheme

(i)    Control of the Stock

67.    Kensington originated as a public company in or around 2009 with a purported focus on leasing equipment to real estate professionals.  According to an SEC filing, on or about January 15, 2009, Angelique D. was the chief executive officer, though Defendant maintained de facto control of all aspects of the business, and Gregory G. was the chief financial officer.  In an amended filing on or about March 25, 2009, Gregory G. was replaced as chief financial officer by Landre M., the husband of Defendant's personal assistant.

68.    Initially, Defendant caused the issuance of only 20,000 shares of stock to Angelique D.  Through a purchase agreement dated on or about April 9, 2010, Defendant caused Angelique D. to gain an additional 6,000,000 shares, purportedly in exchange for approximately $480,000.  Defendant also orchestrated purchase agreements whereby one of his companies, Merrimen, entered into a purchase agreement with Kensington with an option to buy up to

24,000,000 shares. On or about November 9, 2010, Defendant caused Merrimen to exercise a portion of the option to purchase 2,500,000 shares of Kensington. Defendant distributed the purchased shares as gifts. On or about November 9, 2010, Defendant gifted approximately 1,011,184 shares. On or about December 7, 2010, Defendant gifted approximately 1,488,816 shares.

69.     On or about December 1, 2010, Defendant caused Merrimen to sell the right to purchase the remaining 21,500,000 shares to Angelique D.

(ii)     The Fraudulent Stock Manipulations

70.     After gaining control of Kensington's unrestricted shares, Defendant, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Kensington's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Kensington stock at a profit when the share price reached desirable levels.

71.     The co-conspirators sought to manipulate the Kensington stock through manipulative stock trading techniques to a price beneficial to the co-conspirators. Having created the shell company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price. Those public shares were typically purchased by brokers using accounts belonging to clients. Wilshinsky, Gregory G., Jack T., Talman H., and William S. used their position as registered brokers to purchase Defendant's shares in Kensington through their client accounts.

72.     The first Kensington pump started on or about March 29, 2010. That day, Trisha M., at the direction of Defendant, sold 40,000 shares. Those shares were purchased almost exclusively in client accounts controlled by Wilshinsky at Marquis. During this first period, the

17

co-conspirators manipulated Kensington's stock price by setting it at a price of approximately $3.80 per share (with trading volume of approximately 10,500 shares that day).

73.     The value of Kensington's stock had little or no relation to its then current and future earnings potential or business operations. On or about September 29, 2010, Kensington's market capitalization at its closing price of approximately $4.50 per share was approximately $35,550,000 based on approximately 7,900,000 shares outstanding. However, on or about November 22, 2010, Kensington filed a form with the SEC, signed by Trisha M., stating as of on or about September 30, 2010, Kensington had approximately $935,249 in total assets (including for intangibles such as "goodwill"), $374,441 in total liabilities, and $4,071 in revenue since the inception of the business. The form indicated a net loss of $83,122 since inception. On or about September 4, 2012, the stock had fallen to $0.02 per share.

I.     The Casablanca Manipulation Scheme

     (i)     Control of the Stock

74.     Casablanca originated as a public company in or around 2011 with a purported focus on mining precious metals in Chile. According to an SEC filing, on or about March 31, 2011, Defendant was the president of Casablanca, and Trisha M. was the former chief executive officer.

75.     Upon formation as USD, Casablanca's predecessor company, Defendant caused the issuance of 600,000 shares of stock to Trisha M. in consideration of purported set up costs. Through a purchase agreement dated on or about December 7, 2010, Defendant, Angelique D., Thomas R., and companies controlled by Defendant, collectively purchased from USD approximately 21,500,000 shares of stock for the purported amount of $1,100,000. On or about January 19, 2011, Defendant caused Casablanca to issue approximately 800,000 shares of stock

to Wealthmakers, which he controlled through Angelique D. On or about March 20, 2011, Defendant caused Casablanca to enter into a purchase agreement with Angelique D. to sell her an additional 1,000,000 shares of stock in installment.

(ii)     The Fraudulent Stock Manipulations

76.     After gaining control of Casablanca's shares, Defendant, together with others devised and intended to devise a scheme whereby they fraudulently inflated Casablanca's share price and trading volume and then orchestrated the sale and purchase of both the unrestricted and restricted Casablanca stock at a profit when the share price reached desirable levels.

77.     The co-conspirators sought to manipulate the Casablanca stock through manipulative stock trading techniques to a price beneficial to the co-conspirators. Having created the shell company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price. Those public shares were typically purchased by brokers trading in accounts belonging to clients. Defendant also used co-conspirators to solicit potential investors to purchase restricted shares belonging to Defendant and other co-conspirators.

78.     Extending the stock's artificially inflated price allowed the co-conspirators to also sell restricted shares to investors through private placements. For example, investors could see a stock quoted at $5.00 per share and be willing to buy a restricted version for $2.50 per share, thinking that the stock would still be valuable when the restriction was lifted.

79.     Defendant used Small Cap Resource and its promoters, including Kieran K., Kona B., Justin E., and Victor A., to cold call and induce potential investors to purchase shares of Casablanca. The purchases were made on the open market and through private placements at the urging of the promoters. Kona B., Justin E., and Victor A. coordinated with Kieran K. and used

19

stock manipulative techniques, such as match trading, to ensure their clients purchased Defendant's shares.

80.     The first Casablanca pump started on or about September 22, 2010. That day, as USD, the company issued a press release touting a letter of intent to acquire a Chilean gold and copper mining company. One month later, the stock had reached a share price of approximately $10.01 per share.

81.     The value of Casablanca's stock had little or no relation to its then current and future earnings potential or business operations. On or about May 13, 2011, Casablanca's market capitalization at its closing share price of approximately $8.20 per share was approximately $430,343,199 based on 52,480,878 shares outstanding. However, on or about May 16, 2011, Casablanca filed a form with the SEC, signed by Trisha M., stating as of on or about March 31, 2011, Casablanca listed approximately $6,024,225 in total assets (including intangibles such as "goodwill"), $2,586,327 in total liabilities, and a net loss of $371,691 since inception of the business. The form indicated a net loss of $291,741 for the first quarter of 2011. On or about October 9, 2013, the stock had fallen to approximately $0.05 per share.

J.     The Lustros Manipulation Scheme

(i)     Control of the Stock

82.     Lustros first appeared as a publicly traded company in or around 2006 under the name Safari Associates, Inc., and later becoming Lustros in or around 2012. According to an SEC filing, on or about April 18, 2012, Defendant was the chief executive officer and a member of the board of directors for the company. Trisha M. was the chief financial officer and a member of the board of directors.

83.     As of on or about September 30, 2012, the authorized capital stock of Lustros consisted of 100,000,000 shares of common stock and 10,000,000 shares of preferred stock.  On or about March 9, 2012, Defendant caused Lustros to issue 60,000,000 shares of common stock to obtain the rights to Bluestone, a company owned primarily by Angelique D.  In or around April 2012, Defendant caused Lustros to issue 100,000 preferred shares to himself.  In or around June 2012, Defendant caused Lustros to issue an additional 181,818 shares of common stock to Angelique D.

(ii)    The Fraudulent Stock Manipulations

84.     After gaining control of a majority of Lustros' shares, Defendant, together with others devised and intended to devise a scheme whereby they fraudulently inflated Lustros' share price and trading volume and then orchestrated the sale and purchase of the Lustros stock at a profit when the share price reached desirable levels.

85.     The co-conspirators sought to manipulate the Lustros stock through manipulative stock trading techniques to a price beneficial to the co-conspirators.  Having created the shell company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price.  Defendant primarily used co-conspirators to solicit potential investors to purchase restricted shares belonging to Defendant and other co-conspirators.

86.     Defendant used Small Cap Resource and its promoters, including Kieran K., Kona B., Justin E., and Victor A., to cold call and induce potential investors to purchase shares of Lustros.  The purchases were made on the open market and through private placements at the urging of the promoters.  Kona B., Justin E., and Victor A. coordinated with Kieran K. and used stock manipulative techniques, such as match trading, to ensure their clients purchased Defendant's shares.

87.     Defendant also used Jason C. to solicit investors to purchase stock in Lustros via private placement vehicles. Such stock was either owned by Jason C. or Defendant. The investors recruited by Jason C. purchased millions of dollars in Defendant's and Jason C.'s shares, and Defendant paid Jason C. commissions on such investments.

88.     One Lustros pump started on or about October 30, 2013, when the share price was $0.16 per share after having been $1.30 per share one year earlier. Through aggressive promotion by co-conspirators and matching trades to raise volume, the co-conspirators were able to artificially inflate the stock price. Within just over a month, the shares had almost tripled in value to a share price of approximately $0.44 on or about December 5, 2013. By on or about February 7, 2014, the stock price had dropped back down to $0.15 per share, eventually falling to $0.01 per share as of January 5, 2015.

89.     The value of Lustros' stock had little or no relation to its then current and future earnings potential or business operations. On or about November 9, 2012, Lustros' market capitalization at its closing share price of approximately $1.10 per share was approximately $77,830,303 based on 70,754,821 shares outstanding. However, on or about November 14, 2012, Lustros filed a form with the SEC, signed by Trisha M., stating as of on or about September 30, 2012, Lustros had approximately $10,545,799 in total assets (including intangibles such as "goodwill"), $3,098,404 in total liabilities, and a net loss of $3,311,969 since inception of the business. The form indicated a net loss of $1,619,343 for the third quarter of 2012. On or about September 16, 2014, the stock price had fallen to approximately $0.11 per share.

K.    The Gepco Manipulation Scheme

    (i)    Control of the Stock

    90.    Gepco first appeared as a publicly traded company in 2008 under the Kensington name and eventually became Gepco in 2013. According to an SEC filing, on or about May 14, 2014, Angelique D. was the executive chairman of the company, and Trisha M. was the president, chief financial officer, secretary, and a member of the board of directors.

    91.    The authorized capital stock of Gepco consisted of approximately 250,000,000 shares of common stock and 15,000,000 shares of preferred stock. As of on or about March 31, 2014, no shares of preferred stock had been issued. Through convertible notes, Defendant caused Trisha M. to obtain approximately 8,000,000 shares of stock and Walker River to obtain approximately 8,835,480 shares. Defendant caused Gepco to grant an additional 2,000,000 shares of stock to Trisha M. in a subsequent transaction. In or around April 2013, Defendant, through Suprafin, obtained a note that was converted into approximately 27,670,000 shares of stock. In or around August 2013, Defendant, through Sunatco, obtained a note that was partially converted into an additional 2,000,000 shares stock.

    92.    The company's acquisition of GemVest was funded through the issuance of 150,000,000 shares to Peter V., a close friend to Defendant. Defendant dictated to Peter V. how and when he sold the shares, allowing Defendant to retain control of the Gepco stock.

    93.    In furtherance of the Gepco stock manipulation scheme, the co-conspirators made material omissions regarding the payment of commissions when soliciting investors.

    (ii)    The Fraudulent Stock Manipulations

    94.    After gaining control of Gepco's shares, Defendant, together with others devised and intended to devise a scheme whereby they fraudulently inflated Gepco's share price and

trading volume and then orchestrated the sale and purchase of the unrestricted Gepco stock at a profit when the share price reached desirable levels.

95.     The co-conspirators sought to manipulate the Gepco stock through manipulative stock trading techniques to a price beneficial to the co-conspirators.  Having created the shell company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price.  Defendant primarily utilized co-conspirators to solicit potential investors to purchase restricted shares belonging to Defendant and other co-conspirators.

96.     Defendant used Gregory G. to find potential investors to purchase Defendant's shares through private placements and offered Gregory G. a thirty percent commission. Defendant also used Kieran K. to direct his employees at Small Cap Resource to cold call potential investors and induce to invest in Gepco.

97.     The value of Gepco's stock had little or no relation to its then current and future earnings potential or business operations.  On or about March 31, 2014, Gepco's market capitalization at its closing price of approximately $0.19 per share was approximately $42,037,985 based on approximately 221,252,555 shares outstanding.  However, on or about May 14, 2014, Gepco filed a form with the SEC, signed by Trisha M. and Peter V., stating that as of on or about March 31, 2014, Gepco had accrued a net loss of $89,401 since inception and had accumulated a deficit during the development stage of approximately $458,176.  Gepco's stock was suspended from trading in September 2014 by the SEC.

L.     Profits at Investors' Expenses

98.     The co-conspirators, together with others known and unknown to the United States Attorney, obtained millions of shares at no or little cost in the Manipulated Public Companies and then profited by selling their own shares in Lenco, Kensington, Casablanca,

Lustros, and Gepco stock at artificially inflated prices to investors. Little or no portion of the investments went to fund the operations of the Manipulated Public Companies. Rather, Defendant and his co-conspirators used most of the investments to enrich themselves.

99.     Co-conspirators sold their shares in the Manipulated Public Companies to investors without disclosing the payment of commissions. Defendant typically paid, and caused the payment to, co-conspirators in amounts of between thirty and fifty percent of the total sales price of Defendant's stock that was sold with Defendant and entities that he controlled receiving the remainder. In doing so, Defendant and others, enriched themselves and used, among other stock manipulative techniques, matched trades to execute transactions and fraudulently inflate the price of the Manipulated Public Companies' stock.

100.    Defendant also provided shares in the Manipulated Public Companies as commission payments for participation in the conspiracy. Co-conspirators could then sell the shares and keep the proceeds as additional profit for participation in the conspiracy.

101.    Commissions were not limited to cash payments and the issuance of shares to co-conspirators. Specifically, Defendant purchased jewelry and luxury automobiles and paid office rent and other expenses for co-conspirators.

102.    Defendant and his co-conspirators caused over $54,000,000 to be invested in the purchase of stock in the Manipulated Public Companies. In all, Defendant caused a loss to investors in the amount of approximately $27,000,000 from the scheme.

### III.    STATUTORY VIOLATIONS

### COUNT 1

(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 1348; Securities Laws Violations, 15 U.S.C. §§ 78j(b) and 78ff; and Wire Fraud, 18 U.S.C. § 1343; in violation of 18 U.S.C. § 1349)

The United States Attorney further charges:

103.    The allegations contained in paragraphs 1 through 102 are re-alleged and incorporated as though fully set forth herein.

104.    On or about September 28, 2006, through on or about September 18, 2014, both dates being approximate and inclusive, within the Northern District of Ohio, Eastern Division, and elsewhere, Defendant IZAK ZIRK DE MAISON (aka IZAK ZIRK ENGELBRECHT, aka ZIRK ENGELBRECHT), together with others known and unknown to the United States Attorney, did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with others both known and unknown to the United States Attorney, to commit federal offenses, to wit:

a.    To defraud any person in connection with any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 and that is required to file reports under section 15(d) of the Securities Exchange Act of 1934; and to obtain, by means of false and fraudulent pretenses, representations, and promises, any money and property in connection with the purchase and sale of any security of an issuer described herein, in violation of Title 18, United States Code, Section 1348 (Securities Fraud);

b.    To use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material

26

fact and omitting to state material facts necessary in order to make the statements made, in light

of the circumstances under which they were made, not misleading; and (c) engaging in acts,

practices and courses of business which would and did operate as a fraud and deceit upon

investors and potential investors in the Manipulated Public Companies, in connection with the

purchase and sale of investments in the Manipulated Public Companies, directly and indirectly,

by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15,

United States Code, Sections 78j(b) and 78ff (Securities Laws Violations); and

        c.     To devise and intend to devise a scheme and artifice to defraud the

investors, and to obtain money by means of false and fraudulent pretenses, representations, and

promises, and for the purpose of executing such scheme and artifice, to transmit and cause the

transmission by means of wire communications in interstate commerce any writing, sign, signal,

and picture, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

OBJECTS OF THE CONSPIRACY

    105.    The objects of the conspiracy were to unlawfully:  (1) defraud the investors; (2)

obtain investor monies and pay undisclosed commissions; (3) inflate the value of the

Manipulated Public Companies; and (4) enrich the conspirators.

MANNER AND MEANS OF THE CONSPIRACY

    106.    To attain the objects of the conspiracy, Defendant and his co-conspirators

employed the following manner and means:

        a.     It was a part of the conspiracy that the co-conspirators created public

"shell" companies, executed mergers of nascent businesses with the shells to create publicly

traded companies, and then paid undisclosed commissions to consultants, brokers, and boiler

27

room promoters, in exchange for using investor funds to purchase co-conspirators' shares of the resulting stock.

   b.  It was a part of the conspiracy that the co-conspirators used manipulative stock trading techniques, such as wash trades, matched trades, and marking the close trades, to fraudulently inflate the price in the Manipulated Public Companies.

   c.  It was part of the conspiracy that Defendant worked with co-conspirators in the fraudulent scheme to sell his stock in the Manipulated Public Companies.

   d.  It was a part of the conspiracy that the co-conspirators ensured that any time they wanted to sell free trading shares on the open market, there would be available buyers.

   e.  It was a part of the conspiracy that Defendant paid undisclosed commissions, typically thirty to fifty percent of the total sale price, in exchange for co-conspirators selling Defendant's shares via private placements, purchasing them using client accounts on the open market, and inducing investors to purchase them through cold calls.

   f.  It was a part of the conspiracy that the co-conspirators did not disclose to investors the commission payments from Defendant and companies he controlled.

   g.  It was a part of the conspiracy that Defendant used registered brokers to liquidate free trading shares of stock in the Manipulated Public Companies and paid the registered brokers commission payments for purchasing Defendant's shares.

   h.  It was a part of the conspiracy that Defendant used consultants to access wealthy potential investors and paid undisclosed commissions of cash and stock to the consultants when they persuaded their clients to purchase Defendant's shares in the Manipulated Public Companies.

28

i.      It was a part of the conspiracy that Jason C. solicited potential investors to purchase stock in the Manipulated Public Companies without disclosing that he received commissions from Defendant, that it was Defendant's and Jason C.'s shares his clients were purchasing, and that his clients' investments were used to enrich the co-conspirators.

j.      It was a part of the conspiracy that Defendant, Jason C., and others, used private placements, stock promoters, and non-arms-length trading with related parties to create the illusion of volume, to inflate the stock price, and to divest their own shares.

k.      It was a part of the conspiracy that Louis M. provided false documentation to Jason C. to assist with the deposit and sale of securities for the benefit of Jason C. and the other co-conspirators.

l.      It was a part of the conspiracy that Louis M. created his own entities to assist Jason C. in the deposit and sale of shares in the Manipulated Public Companies and to transfer money to overseas brokerage accounts.

m.      It was a part of the conspiracy that Defendant used boiler room promoters to cold call and solicit potential investors to purchase shares of the Manipulated Public Companies.

n.      It was a part of the conspiracy that the cold calls to potential investors coincided with favorable press releases or other information that Defendant caused to be released.

o.      It was a part of the conspiracy that the boiler room promoters touted the Manipulated Public Companies using high pressure sales tactics and misrepresentations about the value of the Manipulated Public Companies and their stock.

p.      It was a part of the conspiracy that the boiler room promoters did not disclose that Defendant paid commissions to them on the sale of Defendant's stock to the investors, either on the open market or through private placements.

q.      It was a part of the conspiracy that Defendant and his co-conspirators used attorneys to draft Rule 144 legal opinions containing misrepresentations to satisfy legal requirements about depositing the stock and lifting restrictions.

r.      It was a part of the conspiracy that to conceal the payment of undisclosed commissions, co-conspirators commonly directed Defendant to transfer such money to entities and third parties to avoid the appearance of a direct payment from Defendant to that co-conspirator.

s.      It was a part of the conspiracy that to further hide the undisclosed commission payments, Defendant made, and caused to be made, payments to co-conspirators and others from a variety of companies he controlled, including Bridges, SB3, Suprafin, and Wealthmakers, instead of using the Manipulated Public Companies' and Defendant's personal bank accounts.

t.      It was a part of the conspiracy that Defendant communicated with the co-conspirators and others via interstate wires, including through e-mail transmissions, to record commission payments that were made and owed.

u.      It was a part of the conspiracy that Defendant transmitted, and caused the transmission of, interstate wires in the form of undisclosed commission payments to co-conspirators for participating in the conspiracy.

v. It was a part of the conspiracy that co-conspirators received shares, both restricted and free-trading, of various stock from Defendant to compensate co-conspirators for participating in the conspiracy.

ACTS IN FURTHERANCE OF THE CONSPIRACY

107. In furtherance of the conspiracy and to effect its unlawful objects, Defendant and the co-conspirators committed, and caused to be committed, the following acts in furtherance of the conspiracy in the Northern District of Ohio, and elsewhere:

a. On or about December 13, 2007, Defendant caused funds in the amount of approximately $10,100 to be transferred from a Royce account ending in x1581 held in Redlands, California, at City National Bank, to an account in the name of Sarah U., for the benefit of Talman H., in New York, New York, at Citibank.

b. On or about September 2, 2008, Defendant caused funds in the amount of approximately $20,700 to be transferred from an SB3 account ending in x7565 held in San Diego, California, at City National Bank, to an account controlled by Herman P., for the benefit of William S., in New York, at Citibank.

c. On or about October 22, 2009, Defendant caused funds in the amount of approximately $36,000 to be transferred from a Bridges account ending in x9797 held in Redlands, California, at Washington Mutual Bank, to an account in the name of the Mazel Trust held in Tarzana, California, at Wells Fargo Bank, for the benefit of Stephen Wilshinsky.

d. On or about November 24, 2009, Defendant caused funds in the amount of approximately $10,000 to be transferred from a Wealthmakers corporate bank account ending in x8413 held in San Diego, California, at City National Bank, to an SMI account controlled by Jason C. and held in Westlake, Ohio, at U.S. Bank.

     e.     On or about June 4, 2010, Defendant caused funds in the amount of approximately $50,000 to be transferred from a Kensington corporate bank account ending in x4134 held in Santee, California, at Wachovia Bank, to a Worldbridge account controlled by Jason C. and held in Westlake, Ohio, at U.S. Bank.

     f.     On or about September 13, 2010, Defendant caused an email to be transmitted with the subject line "[c]ommissions [p]aid," with an attached spreadsheet that detailed the undisclosed commission payments made to Stephen Wilshinsky, Gregory G., Talman H., William S., Jack T., and other co-conspirators.

     g.     On or about September 23, 2010, Defendant caused funds in the amount of approximately $102,300 to be transferred from a Bridges account ending in x9797 held in Santee, California, at JPMC, to an account in the name of the Global Marketing held in Cheyenne, Wyoming, at JPMC, for the benefit of Jack T.

     h.     On or about November 2, 2010, Defendant caused funds in the amount of approximately $22,000 to be transferred from a Suprafin account ending in x9320 held in Santee, California, at Wachovia, to an account in the name of Sarah U., for the benefit of Talman H., held in New York, New York, at Citibank.

     i.     On or about November 22, 2011, Defendant caused funds in the amount of approximately $5,000 to be transferred from a Suprafin account ending in x9320 held in Santee, California, at Wells Fargo, to an account in the name of Small Cap Resource held in Port Washington, New York, at JPMC, for the benefit of Kieran K.

     j.     On or about March 2, 2012, Louis M. caused funds in the amount of approximately $10,000 to be transferred from a Traverse account ending in x5234 held in Bay

Village, Ohio, at Fifth Third Bank, to an account in the name of Small Cap Resource ending in x3820 held in Port Washington, New York, at JPMC, for the benefit of Kieran K.

       k.      On or about July 9, 2012, Defendant caused funds in the amount of approximately $10,000 to be transferred from a Lustros corporate account ending in x8389 held in Santee, California, at Citibank, to an account in the name of WAH.com held in New York, New York, at Citibank, for the benefit of Gregory G.

       l.      On or about August 29, 2012, Kieran K. caused check number 1489 in the amount of approximately $45,000 drawn on the Small Cap Resource account ending in x3820 to be paid to Neoterra for the benefit of Kona B.

       m.      On or about September 7, 2012, Kieran K. caused check number 1509 in the amount of approximately $67,500 drawn on the Small Cap Resource account ending in x3820 to be paid to Esposito Consulting for the benefit of Justin E.

       n.      On or about November 21, 2012, Defendant caused funds in the amount of approximately $8,000 to be transferred from a Suprafin account ending in x8503 held in Santee, California, at U.S. Bank, to an account in the name of William S., held in New York, New York, at Capital One Bank.

       o.      On or about March 8, 2013, Kieran K. caused check number 1706 in the amount of approximately $5,000 drawn on the Small Cap Resource account ending in x3820 to be paid to Victor A.

       All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
(Securities Fraud, 18 U.S.C. § 1348)

The United States Attorney further charges:

108.    The allegations contained in paragraphs 1 through 102, and the factual allegations contained in paragraphs 106 and 107, are re-alleged and incorporated as though fully set forth herein.

109.    From on or around April, 2009, through on or about September 18, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant IZAK ZIRK DE MAISON (aka IZAK ZIRK ENGELBRECHT, aka ZIRK ENGELBRECHT), did knowingly and intentionally execute, and attempted to execute, a scheme and artifice to (a) defraud persons in connections with securities of Gepco, an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, and (b) obtain, by means of materially false and fraudulent pretenses, representations and promises, and by statements containing material omissions, money and property in connection with the purchase and sale of securities of Gepco, an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, and did and abet in the same.

All in violation of Title 18, United States Code, Section 1348.

## COUNT 3
(Securities Law Violations, 15 U.S.C. § 78j(b) and 78ff; 17 C.F.R. § 240.10b-5)

The United States Attorney further charges:

110.    The allegations contained in paragraphs 1 through 102, and the factual allegations contained in paragraphs 106 and 107, are re-alleged and incorporated as though fully set forth herein.

34

111.    From on or about September 28, 2006, through on or about September 18, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant IZAK ZIRK DE MAISON (aka IZAK ZIRK ENGELBRECHT, aka ZIRK ENGELBRECHT), unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

a.    Employing devices, scheme, and artifices to defraud;

b.    Making untrue statements of fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    Engaging in acts, practices, and courses of business which operated and would operate as a fraud upon investors, in connection with the purchase and sale of the securities.

112.    From in or around September 2006, through in or around September 2014, Defendant received and embezzled approximately $30,000,000 in investor monies.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

<u>COUNTS 4 – 7</u>
(Wire Fraud, 18 U.S.C. § 1343)

The United States Attorney further charges:

113.    The allegations contained in paragraphs 1 through 102, and the factual allegations contained in paragraphs 106 and 107, are re-alleged and incorporated as though fully set forth herein.

35

114.    From on or about September 28, 2006, through on or about September 18, 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant IZAK ZIRK DE MAISON (aka IZAK ZIRK ENGELBRECHT, aka ZIRK ENGELBRECHT), knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

115.    On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals, pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit; electronic transfers of funds, in the approximate amounts described below, from accounts described below located in the Northern District of Ohio, into accounts controlled by Defendant, located in California, for what the investors believed to be investments into the Manipulated Public Companies:

| COUNT | DATE | AMOUNT | ORIGINATING BANK | RECEIVING BANK |
|-------|------|--------|------------------|----------------|
| 4 | 12/23/2011 | $750,000 | Huntington Bank, Ohio | Wells Fargo, California |
| 5 | 07/09/2012 | $200,000 | Huntington Bank, Ohio | Citibank, California |
| 6 | 09/07/2012 | $175,000 | Huntington Bank, Ohio | Citibank, California |
| 7 | 05/02/2013 | $250,000 | JP Morgan Chase, Ohio | Citibank, California |

All in violation of Title 18, United States Code, Section 1343.

STEVEN M. DETTELBACH
United States Attorney

By:    *Ann C. Rowland*
ANN C. ROWLAND
Deputy Chief, Criminal Division